NO. 07-97-0495-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JUNE 29, 1999
_____

LEE LEWIS CONSTRUCTION, INC.,

Appellant

v.

NORMA HARRISON, INDIVIDUALLY and as next friend of
SUMER DAWN HARRISON AND JIMMY THOR HARRISON,
and MAY and SELLIE HARRISON,

Appellees
_____

FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 91-534,715; HON. JOHN R. McFALL, PRESIDING
_____

Before Boyd, C.J., Quinn, and Reavis, JJ.

Lee Lewis Construction, Inc. (LLC) appeals from a final judgment 1) awarding damages against it to Norma Harrison, individually and as the next friend of her children Sumer Dawn and Jimmy Thor Harrison, and May and Sellie Harrison (collectively referred to as Jimmy's kin) and 2) granting summary judgment to KK Glass, Inc. (KK). Via eight issues, LLC questions the sufficiency of the evidence underlying the finding of negligence and the award of exemplary damages, the accuracy of a jury issue submitted by the court,

the admission of evidence allegedly depicting subsequent remedial measures, and the validity of the summary judgment granted KK. We affirm in part and reverse in part.

### Background

The lawsuit arose from an incident occurring at a construction site. LLC was retained, as general contractor, by the owner of the site to construct additional floors to an existing building. Methodist Hospital (Methodist) owned the site in question. Of the many subcontractors hired to assist it in performing its contractual duties, LLC retained KK to install "all glass glazing," among other things. While performing his duties under this subcontract, Jimmy Harrison, an employee of KK Glass, fell from the tenth story of the building to his death.

Thereafter, Jimmy's wife (Norma), children (Sumer Dawn and Jimmy Thor) and parents (May and Sellie) sued LLC for negligence, negligence *per se*, and gross negligence. So too did they sue KK, but only for gross negligence. LLC then filed its cross-claim against KK for contractual indemnity or, alternatively, contribution. KK moved for summary judgment upon the claim of LLC, which motion was granted. KK also entered into a settlement agreement with Jimmy's kin, who then non-suited their claims against it.

Eventually, the dispute between Jimmy's kin and LLC was tried to a jury. After hearing the evidence, the latter rendered a verdict that LLC retained "the right to control safety" at the construction site, that LLC was both negligent and grossly negligent, and that the plaintiffs were entitled to compensatory and exemplary damages. Judgment was subsequently entered upon that verdict.

2

***Retention of Control***

The first issue posed concerns the legal and factual sufficiency of the evidence underlying the jury's finding of negligence. Specifically, LLC asserts that, at most, it retained the right to require its subcontractors to abide by general safety measures at the construction site. In retaining this right, it continues, it did not undertake the unqualified duty to ensure a safe workplace for the employees of its independent contractors. Rather, it merely bound itself to ensure that any safety measures it enacted did not increase the risk of harm to those employees. Allegedly, nothing of record illustrates that any of its safety measures increased the risk of harm to Jimmy. Consequently, the evidence of negligence is supposedly inadequate to support the jury's verdict. We disagree, for LLC did more than merely retain the right to have its subcontractors abide by the "general" safety regulations it promulgated.

*1. Standard of Review*

A finding is legally sufficient if some evidence, or the reasonable inferences therefrom, supports it. *Tabor v. Hogan*, 955 S.W.2d 894, 895-96 (Tex. App.--Amarillo 1997, no pet.); *In the Interest of Striegler*, 915 S.W.2d 629, 638 (Tex. App.--Amarillo 1996, writ dism'd w.o.j.). This is determined by first examining the record for evidence favoring the verdict while ignoring that contradicting it. *Id.* If the favorable evidence amounts to more than a scintilla, then the verdict is legally sufficient. *Id.* In other words, if the favorable evidence "'rises to the level that would enable reasonable and fair-minded people to differ in their conclusions,'" then the verdict passes muster. *Associated Indem.*

*Corp. v. Cat Contr., Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998) (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994).

In resolving questions of factual sufficiency, our task differs; we decide if the evidence uncovered through application of the legal sufficiency standard is so weak, or the contrary evidence so overwhelming, as to render the finding clearly wrong or manifestly unjust. *In the Interest of Striegler*, 915 S.W.2d at 638-39. Thus, in conducting a factual sufficiency analysis we consider the entire record, not just the evidence supporting the verdict.

Neither of the foregoing standards enable us to substitute our personal interpretation of the evidence for that of the fact finder. Its authority to assign weight to the evidence, make reasonable inferences therefrom, and assess the credibility of the witnesses remains inviolate under both standards. *Tabor v. Hogan*, 955 S.W.2d at 896.

2.      *Extent of Duty Upon General Contractor*

Normally, a general contractor owes no duty to ensure that an independent subcontractor performs in a safe manner. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 356 (Tex. 1998); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997). Yet, no rule is without exception, and that pertinent here arises from the concept of control. That is, our courts have long recognized that one enjoying the authority to control a matter is in the best position to protect against harm arising from it. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993). Thus, if a general contractor retains the right to control safety at the construction site, it must act reasonably. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d at 356; *Clayton W. Williams, Jr., Inc. v. Olivo*, 952

4

S.W.2d at 528; *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985); *Welch v. McDougal*, 876 S.W.2d 218, 222 (Tex. App.--Amarillo 1994, writ denied). This does not mean that the duty to so act is plenary, however. Rather, it is proportional to the control retained or exercised.[1] *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d at 355; *Exxon Corp. v. Tidwell*, 867 S.W.2d at 23.

The interplay between retained control and scope of duty is much like a sliding scale. As more control is retained over how the subcontractor performs the details of its work, the parameters of the duty proportionally increase. For instance, requiring a subcontractor to abide by the general contractor's safety rules and regulations does not impose upon the latter an unqualified duty to ensure the safety of each employee of the subcontractor. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d at 357-58. Under that circumstance, the general contractor is merely obligated to assure "that any safety requirements and procedures . . . [it] promulgated did not unreasonably increase . . . the probability and severity of injury" to the subcontractor's employees. *Id.* This is so because the control exercised is finite and no greater than the scope of the rules enacted. *See Arias v. MHI Partnership, Ltd.*, 978 S.W.2d 660, 663 (Tex. App.--Corpus Christi 1998, pet. denied) (interpreting *Hoechst-Celanese* as holding that "when an employer promulgates a safety rule or regime, it assumes a narrow duty — to ensure that its rules or requirements are reasonably safe"). And, to the extent that the subcontractor's freedom

---

[1]We say "retained" or "exercised" because the requisite control may be exemplified in either way. That is, it may be reserved by contract or merely exercised by the general contractor *sans* contract. *Welch v. McDougal*, 876 S.W.2d 218, 222 (Tex. App.--Amarillo 1994, writ denied). If reserved by agreement, it matters not whether the general contractor actually exercises it, for liability arises from the mere right to exercise it. *Campbell v. Adventist Health System / Sunbelt, Inc.*, 946 S.W.2d 617, 621 (Tex. App.--Fort Worth 1997, no writ).

to act within the area is impinged, it is so impinged only with regard to the matters encompassed by those particular rules and regulations. In other things, the subcontractor is entirely free to work as it chooses. *See id.* (stating that before the general contractor becomes liable, it must retain a right of control sufficient to limit the subcontractor's freedom to perform as he chooses); RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965) (stating the same).

Yet, as the general contractor increases its authority over matters of safety, its duty to act with reasonable care similarly increases. So, the narrow duty recognized by *Arias* and *Hoechst-Celanese* does not necessarily remain narrow. Conceivably, if all of the subcontractor's independence in the area of safety were usurped then it the general contractor's duty of care would consist of more than merely assuring that its rules do not increase the risk of harm. Indeed, if the area of safety is usurped, then the general contractor would have to exercise reasonable care by not only assuring that its rules do not increase the risk of harm, but also affirmatively promulgating rules which ameliorate unsafe practices or conditions of which it knew or should have known and which were within its control.

### 3. Application of Standard

#### a. Legal Sufficiency[2]

The contract between Methodist and LLC (referred to as the Methodist Contract) contained numerous provisions regarding the supervision of work and safety. For

---

[2]We note that while the standard of review applicable to claims of legal insufficiency obligates us to focus upon the evidence favoring the jury's verdict, LLC focused on that which contradicted it. This did not comport with its appellate burden.

instance, LLC agreed to 1) supervise and direct the work, 2) be solely responsible for all construction means, methods, techniques, sequences, and procedures, 3) coordinate all portions of the work, 4) be responsible to Methodist for the acts and omissions of it, its employees and of its subcontractors and their employees, 5) be "responsible for initiating, maintaining and supervising *all safety precautions and programs* in connection with the [w]ork," 6) take "*all reasonable precautions* for the safety of, and . . . [to] provide all reasonable protection to prevent damage, injury or loss to . . . *all employees* on the [w]ork and *all other persons* who may be affected thereby," including Methodist and "*other separate contractors,*" 7) give "all notices and comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority bearing on the safety of persons . . . or their protection from damage, injury or loss," 8) "erect and maintain . . . all reasonable safeguards for safety and protection," and 9) "designate a responsible member of . . . [its] organization at the site whose duty shall be the prevention of accidents." (emphasis added).

From this we gather that LLC did more than promise Methodist to protect and initiate safety measure simply with regard to LLC employees. Indeed, reference to undertaking all reasonable precautions and providing all reasonable safety measures to protect, from injury, Methodist, "other separate contractors," and "all employees on the [w]ork and all other persons who may be affected thereby" illustrates that those encompassed within LLC's duty included not only employees of LLC but also those of Methodist and the subcontractors. So too do these provisions evince plenary power over matters of safety. Again, LLC agreed to 1) initiate, supervise and maintain *all* safety precautions and

7

programs and 2) take *all* reasonable safety precautions for the safety of *all* employees and persons.

The contract between LLC and KK (referred to as the KK Contract or subcontract) also addressed matters of safety. Though it did not contain the same ubiquitous language as did the Methodist Contract, it did require KK to 1) assume towards LLC all of the obligations and responsibilities that LLC assumed toward Methodist, 2) comply with all codes, laws, ordinances, rules, regulations, and orders of any public authority regarding performance of its work, 3) abide by LLC's safety rules and regulations as well as those of any governmental body having authority to control the manner or method of carrying out the work, 4) have its employees wear hard hats, 5) have its employees "[w]ork off of platforms and scaffolding that conform to OSHA [r]equirements," 6) have its employees use safety belts when working in areas without handrails, 7) have its foreman attend LLC weekly safety meetings, 8) appoint a supervisor who would be responsible for enforcing all safety rules for employees under his direction, 9) report safety violations or serious accidents, 10) provide a first aid kit, 11) insure that equipment utilized at the site was inspected and certified to be in safe working condition prior to use, 12) use safety goggles, 13) properly train its employees, 14) ensure that the equipment used by its employees was safe and in good working order, and 15) permit LLC to remove those KK employees who fail to comply with LLC's safety measures and directives.

Additionally, while nothing in the KK Contract expressly stated that LLC retained the right to control matters of safety, nothing in the agreement expressly prohibited it from doing so. Given this absence of prohibition, the testimony of LLC's president becomes

8

most telling. He first testified that LLC "want[ed] responsibility of" safety on the job site. Then, he conceded that LLC retained the right to control safety on that job site, "even in terms of making sure that [the] subcontractors *did their work safely.*" (emphasis added). Furthermore, the work which LLC intended to "mak[e] sure" was done safely included that performed by KK and all other subcontractors. That the subcontract did not affect LLC's ability to "make sure that they [the subcontrators] did their work in a safe *manner*" was also conceded. (emphasis added).

So too did LLC's president discuss the duties of the superintendent LLC retained and placed at the site. Allegedly, the superintendent was hired, in part, "to help prevent an employee of the subcontractor from inadvertently and unnecessarily falling to their [sic] death." To that end, this superintendent was obligated to walk the site while "construction was ongoing to look for safety hazards, including *inappropriate use of fall protection equipment*" and halt unsafe practices. (emphasis added). He was also expected to assess whether "proper [fall] technique" (or fall protection) was being utilized by the subcontractors and, if unsafe techniques were discovered, "correct what they [sic] were doing until they got it safe."[3] So too could he direct employees of subcontractors to leave the site if they did not comply with his safety directives.

Admittedly, LLC may not have expressly reserved the right to control safety in the KK Contract. Yet, in 1) promising Methodist that it would initiate all reasonable safety precautions and provide all reasonable safety protection to those working at the site,

---

[3]Incidentally, the superintendent himself agreed that his official duties included the "need to make sure they [the subcontractors] do [their job] safely."

including "other contractors" such as KK, 2) assigning one of its superintendents to oversee the project, observe the activities of its subcontractors for safety hazards including the inappropriate use of fall protection, assess their use of proper fall techniques, and make them correct unsafe practices until he was satisfied, 3) retaining the authority to remove those who did not perform safely, 4) vesting the ability to exercise the latter authority in its superintendent, and 5) concluding that the subcontract did not affect its ability to assure that the subcontractor worked in a safe "manner," LLC effectively controlled the matter of job safety. *See Welch v. McDougal*, 876 S.W.2d at 223 (stating that liability may be imposed when the general contractor retains control over the "*manner*" in which the work is performed).

Simply put, some evidence illustrates that LLC did more than merely direct its subcontractors to follow promulgated rules of safety, which distinguishes this case from *Hoechst-Celanese*. More than a scintilla of evidence illustrates that it assumed the duty to affirmatively act *vis-a-vis* matters of safety, including the use of fall protection and that KK was not entirely free to do the work in the manner it deemed safe. Consequently, and contrary to LLC's assertion, legally sufficient evidence supports the conclusion that LLC retained the right to control the "manner" in which KK was to safely perform its contractual duties, including those pertaining to the use of equipment to prevent falls.

b. *Factual Sufficiency*

Evidence does exist which illustrates that KK assumed various duties with regard to safety, training, and the use of safe equipment. Provisions of the KK Contract, for example, imposed upon it the obligation to train its employees about acceptable work

10

practices and ensure the safety of the equipment to be used. So too did KK bind itself to perform *vis-a-vis* LLC the very same duties LLC agreed to perform *vis-a-vis* Methodist. Yet again, nothing in the subcontract precluded LLC from exercising control over safety, possibly because to so relinquish that power could effect a breach by LLC of the Methodist Contract. Furthermore, as discussed above, LLC hired an individual to search for unsafe activities, assess the safety practices of KK and the other subcontractors, and require that those safety practices be changed until he personally considered them acceptable. If the subcontractors' employees disagreed with him, LLC vested its employee with the authority to terminate their involvement with the project.

As can be seen, the evidence is mixed and we do not find that which contradicts the verdict to be so overwhelming as to render the verdict clearly wrong or manifestly unjust. Therefore, the record compels us to also reject LLC's factual sufficiency attack.

### *The Jury Question on Lewis's Right of Control*

LLC next questions the propriety of the first issue propounded to the jury.[4] Allegedly, it was too general. Instead of asking the jury to decide if LLC "retained the right to control safety on the project" in general, the court was supposedly obligated to ask if LLC retained the "right to control the specific activity that allegedly resulted in [Jimmy's] death: that is, the use of the double-lanyard harness system or the . . . bosun's chair." (emphasis omitted). We conclude that the dispute is immaterial or moot because LLC did not also attack the wording of question number two and its accompanying instruction.

---

[4]Question one read: "Did Lee Lewis Construction, Inc. retain the right to control safety on the construction project where Jimmy Harrison suffered his fatal fall?" The jury answered "yes."

11

Question two asked the jury to determine if "the negligence, if any, of . . . [LLC and Jimmy] proximately cause[d] the occurrence." Furthermore, the trial court instructed the jury that negligence meant:

> the failure to use ordinary care with regard to its retained right of control, if any, to reduce or eliminate an unreasonable risk of harm created by an activity or condition on the premises which the general contractor either knows about or in the exercise of *ordinary care* should know about.

For the jury to answer the question in the affirmative, it was implicitly required to visit anew the issue of "right to control" and hold that such right was retained. Because it answered the question "yes," LLC's liability can be founded upon the jury's answer to question two, irrespective of its answer to, and the wording of, question one.

LLC did not attack the wording of question two. So, regardless of how we resolve its complaints about the wording of question one, liability can still be based upon the affirmative answer to question two. *See El Paso Natural Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 72 (Tex. App.--Amarillo 1997, pet. granted) (appellate courts may not raise error *sua sponte* and are limited to addressing issues presented by parties); *Lance v. USAA Ins. Co*, 934 S.W.2d 427, 433 n.1 (Tex. App.--Waco 1996, no writ) (complaint to one part of judgment is waived if not briefed even though error in other part is briefed). In short, this means that LLC's complaint *vis* the wording of question one is immaterial.

### *Proximate Cause*

LLC next contends that the judgment was improper because the evidence failed to establish that its misconduct proximately caused Jimmy's death. This is allegedly so because no one saw him fall. Nor did Jimmy's kin present evidence illustrating the cause

of his fall, argues LLC. Because the jury was left to speculate about why and how he fell, it allegedly could not conclude that any breach of duty by LLC proximately caused the fall and resulting death. We reject the proposition.

*1. Standard of Review*

In essence, LLC's complaint is again one concerning the sufficiency of the evidence to support the verdict. Thus, the standard of review discussed in the first issue is applicable here and need not be reiterated.

Proximate cause consists of two elements, cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). The presence of both may not be established by mere conjecture, guess, or speculation. *Id.* Instead, the complainant must present evidence supporting their existence. As to the matter of cause in fact, that evidence must be enough to illustrate that the breached duty in question constituted a substantial factor in bringing about the harm of which complaint is made. *Id*. That is, it must be enough to justify the conclusion that the injury was the natural and probable result of the breach. *Id.* With regard to foreseeability, proof of anticipation is required; foreseeability exists when the evidence illustrates that the defendant should have reasonably anticipated that its misconduct created danger of injury of the general character involved in the suit. *Id.* at 478.

*2. Application of Standard[5]*

Jimmy's kin asserted in its live pleading that LLC had a duty to, among other things, exercise reasonable care in supervising and implementing the use of proper fall protection by KK's employees. Evidence presented at trial indicated that the fulfillment of the duty encompassed the development and implementation of a safety program addressing three

---

[5]Because LLC's argument does not concern the foreseeability aspect of causation, we only address the subject of cause in fact.

14

aspects. The first concerned the prevention of a fall, the second, the cessation of the fall once it occurs, and the third, the timely recovery of personnel once the fall has been interrupted. Other evidence indicated that under the circumstances of this case, a separate lifeline was needed to fulfill the second aspect. Indeed, LLC's own safety program required the use of lifelines (along with lanyards and a safety belt) by those individuals performing tasks that entailed a risk of falling. So too did testimony evince that 1) the use of such a lifeline would prevent one from falling to his death once he fell, 2) LLC neither demanded that such a lifeline be used by KK employees nor provided one for use by those employees, 3) LLC's superintendent actually saw Jimmy performing working on a four to five inch window sill far above ground without a lifeline, and 4) LLC's superintendent did nothing to stop Jimmy from so performing, despite the dictates of LLC's own safety program.

This constitutes some evidence that the failure to provide a lifeline caused Jimmy's death and that the harm arising from that omission was reasonably foreseeable by LLC; as much is exemplified simply by LLC requiring use of a lifeline in its policies and then ignoring that policy once it knew it was being violated. Moreover, the evidence which contradicted the finding of causation was not of such a quantum so as to render the determination clearly wrong or unjust. Thus, we conclude that both legally and factually sufficient evidence supported the jury's finding of proximate cause.

Next, LLC's contention involving the absence of evidence about why Jimmy fell does not affect our conclusion. This is so because the argument merely implicates the first of the three categories of care LLC was to provide. In other words, it merely concerned

15

the duty relating to the development and implementation of measures to prevent a fall. Yet, how the fall occurred mattered not to the allegation that LLC had the duty to take measures to protect Jimmy once he fell. Simply put, LLC's argument relates to one distinct duty while the evidence supporting recovery relates to another. Because the evidence may have been insufficient to prove causation *vis* the breach of the former, it does mean it is insufficient to prove causation *vis* the breach of the latter. Furthermore, it is this dissimilarity in the duties involved which renders inapposite various opinions relied upon by LLC.

For instance, in *Summers v. Fort Crockett Hotel, Ltd.*, 902 S.W.2d 20 (Tex. App.--Houston [1st Dist.] 1995, writ denied), the focus was upon defects in the condition of the hotel which caused or facilitated a person's fall from a balcony. Because there was no evidence illustrating why the victim fell, the court was bound to conclude that the purported defects in the building in fact caused his fall. *Id.* at 25-26. Unlike the situation at bar, the court did not have before it the question of whether the hotel had a duty to provide means to stop a fall once it occurred and breached that duty.

Similarly, the plaintiff in *Hopper v. J.C. Penney Co.*, 371 S.W.2d 750 (Tex. Civ. App. --Fort Worth 1963, writ ref'd n.r.e.), posited that the defective condition of the stairs maintained by J.C. Penney caused her to fall. Because the impetus of her fall was unknown, the court held that no one could conclude that the stairs caused her fall. Thus, an instructed verdict for the defendant was appropriate. Like the court in *Summers*, that in *Hopper* was not asked to determine whether J.C. Penney had breached a duty to

16

provide safety measures once someone fell on the stairs. So, like *Summers*, *Hopper* to is inapposite.[6]

### *Evidence of Subsequent Remedial Measures*

Next, LLC complains of the trial court's decision to admit evidence of what it considers to be subsequent remedial measures. The evidence in question concerned the installation of a steel cable to which KK's employees attached their lanyards and the provision of a scaffold for use by those same employees. Allegedly, this evidence was admitted in violation of Texas Rule of Evidence 407. We disagree.

*1.    Standard of Review*

Whether to admit or reject evidence lies within the trial court's considered discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). That discretion is abused only when the court's decision deviates from guiding rules or principles. *Id.* at 754. The guiding rule pertinent here is Texas Rule of Evidence 407, which states that subsequent remedial measures are inadmissible to prove negligence or culpable conduct. *Exxon Corp. v. Roberts*, 724 S.W.2d 863, 869 (Tex. App.--Texarkana 1986, writ ref'd n.r.e.); *City of Amarillo v. Reid*, 510 S.W.2d 624, 630 (Tex. Civ. App.-- Amarillo 1974, writ ref'd n.r.e.). However, it does not demand exclusion if the evidence is offered for another purpose, such as to prove, among other things, control. TEX. R. EVID.

---

[6]The other case cited by LLC, *Texas Dept. of Corrections v. Jackson*, 661 S.W.2d 154 (Tex. App.-- Houston [1st Dist.] 1983, writ ref'd n.r.e.), is also distinguishable for the same reason *Summers* and *Hopper* are. That is, what precipitated the original accident was of concern there, whereas our case involves the duty to take particular action in the event an accident occurs.

17

407(a); *Roosth & Genecov Prod. Co. v. White*, 262 S.W.2d 99, 104-105 (Tex. 1953) (discussing the principle and its exceptions).

For example, if the existence of one's duty to act depended upon his right to control a matter and dispute existed as to which of two parties had that right, then evidence of one's party's amelioration of a condition (after an injury occurred) is admissible as evidence illustrating that the party ameliorating the condition had control over the matter. *Spurr v. LaSalle Constr. Co.*, 385 F.2d 322, 327-28 (7th Cir. 1967) (applying the comparable federal rule); 2 J. WEINSTEIN, M. BERGER, & J. MCLAUGHLIN, WEINSTEIN'S EVIDENCE ¶ 407[04] (1996).

### 2.    Application of Standard

Here, LLC denied that it had the right and obligation to control safety measures in general and the fall protection utilized by KK's employees in particular. Yet, that it installed the steel cable and provided a scaffold for use by those employees is evidence akin to that contemplated in *Spurr* and WEINSTEINS'S EVIDENCE. In other words, it is probative on the question of who exercised control over safety measures utilized by those working above ground and outside the building, *i.e.*, LLC or each subcontractor.[7] Thus, it was admissible under rule 407(a) and the trial court did not abuse its discretion in admitting it.

Nevertheless, LLC posits that before the evidence could be admitted, Jimmy's kin had to illustrate that KK was required by LLC to utilize the devices LLC provided. To so suggest is to argue that one must prove that another controlled a certain activity before

---

[7]Whether its probative value is outweighed by undue prejudice, *see* TEX. R. EVID. 403, is not before us.

18

evidence illustrating that he controlled it can be admitted. We reject the suggestion. Proof that LLC controlled KK (via proof that KK was obligated to use the device) is not a condition precedent to the admissibility of evidence illustrating that LLC controlled KK. And, assuming by some stretch of the imagination that it were, such proof exists at bar; LLC's president testified that it could remove from the site those who did not abide by its safety directives. So, if LLC told KK to use the steel cable and scaffold, KK had to or risk being removed.

We also reject LLC's contention that the limiting instruction provided to the jury was a comment on the weight of the evidence.[8] This is so because the particular ground is urged here for the first time contrary to Rule 33.1(a) of the Texas Rules of Appellate Procedure. Furthermore, the instruction does not reasonably tend to suggest anything about the mental impressions or belief of the court nor minimize or place emphasis on any of the evidence. *First Nat'l Bank of Amarillo v. Jarnigan*, 794 S.W.2d 54, 62 (Tex. App.--Amarillo 1990, writ denied).

### *Evidence Supporting Compensatory Damages Awarded to Jimmy*

Next, the trial court submitted a question to the jury asking it to determine what monies would "fairly and reasonably compensate[] Jimmy Harrison for pain and mental anguish." It answered $500,000. LLC contends that this answer lacks factually sufficient evidentiary support. This is allegedly so because Jimmy's kin "failed to establish through any testimony or evidence whatsoever that Jimmy . . . consciously experienced any pain,

---

[8]The trial court told the jury, via the charge, that evidence of subsequent remedial measures was "not to be considered as proof of negligence, but only as evidence of control and for purposes of impeachment."

19

suffering or mental anguish." In other words, LLC disputes the award because it believes that the evidence fails to evince that Jimmy was conscious of his ten story fall and its ramifications. We agree in part.

*1.     Standard of Review*

We discussed above the standard of review applicable to claims of factual insufficiency.  The parties are referred to it.

Damages for pain and mental anguish are recoverable in suits for personal injury.  However, they must be sought for recompense for pain and anguish experienced while conscious.  *Southern Pacific Transp. Co. v. Luna*, 730 S.W.2d 36, 38 (Tex. App.--Corpus Christi 1987, no writ); *Burrous v. Knotts*, 482 S.W.2d 358, 363 (Tex. Civ. App.--Tyler 1972, no writ).  Because the amount to award is not calculable by any mathematical formula, the fact finder enjoys discretion in determining the sum.  *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).  Yet, its discretion is not unbridled.  *Id.*; *Burlington Coat Factory Warehouse of El Paso, Inc. v. Flores*, 951 S.W.2d 542, 548 (Tex. App.--El Paso 1997, no writ).  A jury is not free to simply select any amount which it may care to.  *Saenz v. Fidelity Guar. Ins. Underwriters*, 925 S.W.2d at 614.  Rather, the sum derived must be that which fairly and reasonably compensates the injured for undergoing the experience.  *Id.*

In assessing the validity of the jury's finding, our task is twofold.  Not only must we peruse the record to determine whether evidence illustrates that the injured experienced compensable pain, suffering, and anguish but also that the amount awarded for experiencing same is reasonable.  *Id.*; *Burlington Coat Factory Warehouse of El Paso, Inc. v. Flores*, 951 S.W.2d at 548.  Whether the complainant suffered a severe physical injury is one indicia which we can consider for pain and anguish presumably accompanying such an injury.  *Bedgood v. Madalin*, 589 S.W.2d 797, 806 (Tex. Civ. App.--Corpus Christi

21

1979), *affirmed in part and reversed and remanded in part on other grounds*, 600 S.W.2d 773 (Tex. 1980).

In addition to the nature of the injury, another factor concerns the consciousness of the individual and the duration of the injury's effects. *See Gulf States Utilities Co. v. Reed*, 659 S.W.2d 849, 855 (Tex. App.--Houston [14th Dist.] 1983, writ ref'd n.r.e.) (concluding that five seconds of pain inflicted via electrocution supported an award of $10,000); *Burrous v. Knotts*, *supra* (reducing the award by $30,000 to $10,000 because the jury did not distinguish between periods of consciousness and unconsciousness). Contemplated within this is consciousness not only of pain and suffering but also of approaching death. *Hurst Aviation v. Junnell*, 642 S.W.2d 856, 859 (Tex. App.--Fort Worth 1982, no writ). So too are the degree (*i.e.* severity) and duration of the pain and distress, *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (noting that the court must distinguish between shades and degrees in evaluating claims of mental anguish), the extent to which the daily routine of the injured is disrupted, *id.*, and the similarity of the award with those in other cases of import.[9] *Landreth v. Reed*, 570 S.W.2d 486, 490 (Tex. Civ. App.--Texarkana 1978, no writ).

### 2. Application of Standard

The record reveals that Jimmy fell from the tenth floor, a height approximating 120 to 140 feet from the ground. His colleague saw him fall from the window. Another witness,

---

[9]While the factors we itemized are not exhaustive, we nevertheless reject the notion of Jimmy's kin that the amount of money a reasonable person would take to voluntarily undergo the same incident is pertinent. We do so because it is inherently specious. Simply put, a reasonable person would never opt to fall to his death in exchange for money.

Ed Smith, heard a yell, looked up, noticed Jimmy within feet of the ground, and saw him land within 20 to 30 feet of Smith's location. Smith concluded that the person who he heard yelling was Jimmy, attempted to call a supervisor, and proceeded to the spot where Jimmy lay. Before arriving, Smith was told to stop because Jimmy was dead.

We are cited to no evidence suggesting that Jimmy was either conscious or even alive at anytime after striking the ground. Nor does our own investigation of the record uncover any. Given this, we have no basis upon which to hypothesize, much less conclude, that Jimmy was either conscious or alive immediately after reaching the ground. Rather, the distance of his fall, the blood spatter, and the manner of his landing would indicate that he was neither alive nor conscious.

In effect, all that can be inferred from this record is that Jimmy was conscious while falling and perceived his fall, as suggested by his yelling. Yet, through the application of physics (a body of mathematics of which we take judicial notice), his perception of the fall and its potential consequence could have lasted no more than 2.7 to 4 seconds. And, given Jimmy's death, whether he will experience disruption in his daily routine matters not.

Thus, the question devolves into one more within the realm of philosophy than jurisprudence and it concerns the amount of money which would reasonably compensate someone who knew that he would be dead within seconds. The youth in *Gulf States Utilities* suffered approximately five seconds of electrocution before dying. The jury valued those few seconds and the concomitant pain and anguish at $10,000, an amount the appellate court found acceptable. *Gulf States Utilities Co. v. Reed*, 659 S.W.2d at 855. In *Hurst Aviation*, wherein the decedent was aware of his descent from the sky for

23

apparently less than a minute, the value was set at $20,000; this sum the appellate court also found acceptable. *Hurst Aviation v. Junell*, 642 S.W.2d at 859. In *Green v. Hale*, 590 S.W.2d 231 (Tex. Civ. App.--Tyler 1979, no writ), wherein consciousness of the dire circumstances was brief, the court approved an award of $5,000. *Id.* at 237-38. In *Guzman v. Guajardo*, 761 S.W.2d 506 (Tex. App.--Corpus Christi 1988, writ denied), two of three justices thought an award of $600,000 for at least fifteen minutes of pain and suffering was reasonable. *Id.* at 512.

Conversely, $65,000 was considered an excessive award for one who was conscious while drowning in *Landreth*. Thus, the court reduced the sum to $35,000. *Landreth v. Reed*, 570 S.W.2d at 492. Similarly, an award of $40,000 for living ten minutes after the onset of a fire was deemed excessive by $30,000 in *Burrous*. So, remittitur was ordered.

After considering the sparse evidence of record, the few seconds involved, and the verdicts rendered in other cases, we conclude that some evidence supports the award of damages for pain, suffering, and mental anguish. However, the 2.7 to 4 seconds of mental anguish experienced is factually insufficient to support an award of $500,000. Remittitur is appropriate.

### Exemplary Damages and Gross Negligence

24

Next, LLC posits that the exemplary damages awarded to Jimmy's kin lacked legally and factually sufficient evidentiary support. This is so because they allegedly failed to prove that LLC acted grossly negligent.[10] We disagree.

---

[10]Jimmy's kin were awarded exemplary damages of $5,000,000. In contesting that award, LLC merely attacks the underlying finding of gross negligence. It does not argue that the amount awarded was excessive. Thus, we need not analyze the validity of the sum itself pursuant to the edict of *Ellis County State Bank v. Keever*, 915 S.W.2d 478 (Tex. 1995).

*1.    Standard of Review*

We incorporate the standard of review applicable to claims of legal and factual insufficiency expressed *supra*. For the finding of gross negligence to be supportable, the evidence must satisfy two prongs. First, when viewed objectively from the actor's standpoint, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). That is, the defendant's acts or omissions must create a grave risk of substantial injury. *Universal Servs. Co. v. Ung*, 904 S.W.2d 638, 641 (Tex. 1995). Furthermore, this risk of injury created by the defendant's conduct must be more than remote. In *Transportation Insurance Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994), the court noted that the misconduct must "greatly increase[] the likelihood" of serious injury. *Id.* at 22 n.14. In other words, the chance of such harm must be likely, as opposed to remote. *Id.* at 22; *see Mobil Oil Corp. v. Ellender,* 968 S.W.2d at 921 (construing the element as requiring proof that the defendant's conduct produced a "likelihood of serious injury"); *Universal Serv. Co. v. Ung*, 904 S.W.2d at 641 (stating the same).

Under the second prong, the actor must actually be aware of the risk he is creating and nevertheless proceed with his conduct in conscious indifference to the rights, safety, or welfare of others. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d at 921. Stated differently, the second element obligates the complainant to prove that the defendant knew of the grave peril accompanying his activity but did not care about it. *Id.*

As can be seen, more than mere negligence is necessary. Again, the actor's behavior must reasonably form a likelihood of serious injury and the likelihood must be

26

known to and, consciously ignored by, the actor. Finally, one may rely upon circumstantial evidence to prove each of these elements. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d at 921.

2. *Application of Standard*

a. *Legal Sufficiency*

i. *First Prong -- Conduct Creating Extreme Risk*

Jimmy's kin is correct in saying that "it is important to first define the risk" involved. As required by *Mobil* and *Ung*, the pertinent risk here is that created or caused by the action or inaction of LLC. Thus, it is not enough to suggest, as do Jimmy's kin, that the risk involved here was that "workers would fall ten stories to their deaths," for that proposition neither considers the duties of LLC nor its acts or omissions in relation to those duties. That is, the risk of falling to one's death is but part of the equation. The remainder addresses whether LLC's conduct was such as to make the chance of falling to one's death likely. The conduct in question pertains to LLC's failure to provide adequate fall protection contrary to its duty to do so. Thus, to satisfy the first prong, more than a scintilla of evidence must exist illustrating that a reasonable person viewing the circumstances from the standpoint of LLC would conclude that the conduct of LLC in failing to provide adequate fall protection created an extreme and likely risk of a worker falling to his death. We now turn to the record to determine if such evidence exists.

To complete the construction project, some of the work had to be performed outside the building by people hanging off the 9th and 10th stories. Working against those individuals would be Newton's law of gravity. Furthermore, it was generally understood that gravity coupled with the distance from which the workers would hang made death the

27

likely result of any fall. That falling was not a foreign concept in the construction industry is exemplified by the testimony of LLC's president, who conceded that falls were one of the "top" causes of serious injury or death at construction sites. Another witness called it the "number one killer of construction workers." So too did the president, who had been involved in the construction industry for many years, acknowledge other matters of import. The first concerned his belief that there was no greater hazard to workmen at the site and the second that the failure to use "proper fall protection techniques . . . could expose . . . subcontractor employees to a fall that would result in certain death." Other witnesses, including representatives of LLC, concurred in this assessment.

Though disputed, some expert evidence further illustrates that the devices actually utilized by Jimmy (a lanyard and safety belt) were themselves hazardous or deficient. Had he hung from them, he could have have broken his back or suffocated. That this equipment was being used by Jimmy, without an independent lifeline, was known to LLC, for its supervisor saw him utilizing it.

Other evidence depicts LLC opting to allow each subcontractor to select and implement its own safety measures. It believed that responsibility for the safety of an independent contractor's employees lay with the independent contractor, not LLC. So, safety issues were left to the contractor, even though LLC employed an individual with authority to monitor, regulate, and affect the safety practices of those subcontractors.

In sum, we have before us evidence that LLC remained silent (while having a duty to act) when Jimmy was performing a job 1) at such an altitude that a fall would result in death and 2) with equipment inadequate to protect him from death should he fall. LLC did

28

this while knowing that falls were not uncommon occurrences but rather major causes of death at construction sites. From this evidence, a reasonable person could conclude that LLC's failure to provide adequate fall protection created an extreme and likely risk of death. Thus, legally sufficient evidence supports the first prong.

>  ii.    Second Prong — Subjective Awareness and Conscious Indifference

As previously mentioned, to satisfy the second prong of *Ellender*, some evidence must exist illustrating that the defendant knew of the extreme risk accompanying its activity but did not care. We find that such evidence appears of record in several ways, the first of which involves the testimony of LLC's president. Again, he stated that falling was a prime cause of injury, a major hazard to those working at the site, and likely to result in death given the height at which KK's employees would be working. Furthermore, the individual hired by LLC to supervise the construction and the safety measures being utilized saw Jimmy working without an independent lifeline some 120 feet above the ground. This is of import because the LLC safety program required the use of "[l]ifelines, safety belts, *and* lanyards . . . where there is a danger of falling." (emphasis added). Having seen Jimmy without an independent lifeline and despite LLC's own regulations, LLC's vice-principal said and did nothing to curtail the activity.

That this disregard comported with what could be perceived as a general policy of disregarding safety risks posed to subcontractors finds support in other evidence. For instance, the very same vice-principal alluded to above eschewed meeting with subcontractors to discuss safety measures. Both he and LLC's president simply believed

that such matters were not LLC's concern, even though it 1) represented to Methodist that it would have plenary responsibility for the safety of everyone working at the project and 2) it required, via its "Safety Program," that all employees (which included the vice-principal) to insist that fellow employees follow safety rules and practices. From this, one could reasonably infer that LLC consciously opted to forego performing those safety duties (*vis* safety) which it not only told Methodist it would perform, but also told the jurors at times that it had the power to perform.

Moreover, evidence disclosed that LLC had other equipment which could have made the performance of Jimmy's duties safer. One such device was a swinging stage scaffold. Evidence, though conflicting, indicated that while LLC employees were free to use it, those employed by subcontractors were not. Instead, the latter were given the option to rent it or acquire their own.

From the foregoing, a rational jury could conclude that LLC was not only aware of the grave risk in question but also that it opted to consciously disregard it. Thus, the finding that LLC was grossly negligent enjoys legally sufficient evidentiary support. Our conclusion is not altered by LLC's contention that it exercised some care by its institution of a safety program and retention of purported safety consultants. Reference to such evidence is of little value when the question is one of legal sufficiency. This is so because the standard of review obligates us to consider evidence supporting the verdict, not contradicting it. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d at 924 (holding that Mobil's reference to some evidence of care did not affect the court's legal sufficiency analysis).

       *b.     Factual Sufficiency*

That there existed evidence contradicting the jury's finding of gross negligence is beyond dispute. As alluded to in the previous paragraph, LLC presented some testimony that it exercised care. Other testimony indicated that it believed the equipment utilized by Jimmy was safe and complied with standards implemented by the Occupational Safety and Health Administration. While this court may not have reached the same conclusion as that of the jury had it been the fact finder, we are unable to say that the verdict was factually insupportable. In other words, the evidence supporting the verdict was not insubstantial or weak. Nor was that contradicting the verdict so overwhelming as to render the verdict clearly wrong or manifestly unjust.

### *Summary Judgment in Favor of KK*

In its last point of error, LLC argues that the trial court erred in granting summary judgment to KK and, thereby, denying it contribution and indemnity against KK. We disagree.

*1.      Standard of Review*

The standard of review for assessing the validity of a summary judgment is well known. We refer the litigants to *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796 (Tex. 1994), for discussion of same.

*2.      Application of Standard*

Upon suit by Jimmy's kin, LLC initiated a cross-claim against KK for contribution and indemnity. It did so based upon paragraph 11.7 of the subcontract.[11]  KK moved for

---

[11] The provision states:

To the fullest extent permitted by law, Subcontractor shall indemnify, hold harmless, and

31

summary judgment, arguing that section 408.001 of the Texas Labor Code insulated it from liability and that paragraph 11.7 did not satisfy the express negligence rule. The trial court granted the motion, but did not state the particular grounds upon which it did. Thus, our task is to determine whether either ground supported the court's action. *Miller v. Galveston/Houston Diocese*, 911 S.W.2d 897, 899 (Tex. App.--Amarillo 1995, no writ).

### a. Section 408.001

Section 408.001 of the Labor Code states that the recovery of workers' compensation benefits is the exclusive remedy available to an employee against his employer (assuming that the employer subscribes to the Workers Compensation Act). TEX. LAB. CODE ANN. § 408.001(a) (Vernon 1996). Since KK apparently subscribed to the Act, both Jimmy and his kin were barred from suing it for compensatory damages. This bar also had the incidental effect of shielding KK from suit by a third-party under common law concepts of indemnity and contribution. *See Varela v. American Petrofina Co. of Texas, Inc.*, 658 S.W.2d 561, 561-63 (Tex. 1983) (denying a third-party defendant the opportunity to obtain contribution and indemnity from the employer). Yet, the scope of the shield is limited. It does not apply to situations where an employer expressly agreed, in writing, to indemnify the third-party before the mishap giving rise to the need for indemnity

---

defend Contractor . . . from and against all claims, damages, losses, and expenses . . . arising out of or resulting from the performance of Subcontractor's Work . . . provided that any such claim, damage, loss, or expense (a) is attributable to bodily injury, sickness, disease, or death . . . and (b) is caused in whole or in part by any negligent act or omission of Subcontractor or anyone directly or indirectly employed by it or anyone for whose acts it may be liable . . . regardless of whether it is caused in part by a party indemnified hereunder.

occurred. Act of May 5, 1983, 68th Leg., R.S., ch. 131, § 1, 1983 Tex. Gen. Laws 613, 614 (amended 1989, 1993, current version at TEX. LAB. CODE ANN. § 417.004 (Vernon 1996));[12] *Enserch Corp. v. Parker*, 794 S.W.2d 2, 7 (Tex. 1990); *Faulk Mgt. Servs. v. Lufkin Indus., Inc.*, 905 S.W.2d 476, 478-79 (Tex. App.--Beaumont 1995, writ denied); *Verson Allsteel Press Co. v. Carrier Corp.*, 718 S.W.2d 300, 302-303 (Tex. App.--Tyler 1985, writ ref'd n.r.e.). The agreement at bar was such an agreement.

Via paragraph 11.7 of the subcontract, KK expressly committed to "indemnify . . . and defend" LLC " from and against all claims, damages, losses, and expenses . . . arising out of or resulting from" the performance of KK's work. The claims subject to indemnification included those "attributable to bodily injury, sickness, disease, or death" and "caused in whole or in part" by the negligence of KK, "regardless of whether . . . [LLC] caused [it] in part."

That 11.7 was executed before Jimmy fell to his death is undisputed. Equally clear is that it expressly mentions indemnification, the conditions which trigger the duty to indemnify, the party obligated to provide indemnity, and the party to be indemnified. Indeed, the clause at bar is not unlike those in *Enserch, Faulk*, and *Verson* which were found to satisfy the statutory indicia. Each illustrated the requisite intent to indemnify in

---

[12]The statute read:

> If an action for damages on account of injury to or death of an employee of a subscriber is brought . . . against a person other than the subscriber . . . and if such action results in a judgment against such other person . . . the subscriber . . . shall have no liability to reimburse or hold such other person harmless on such judgment . . . nor shall the subscriber . . . have any tort or contract liability for damages to such other person because of such judgment . . . in the absence of a written agreement expressly assuming such liability, executed by the subscriber prior to such injury or death.

33

specific terms. That none expressly mentioned that the duty to indemnify encompassed damages arising from injury suffered by an employee of the indemnitor matters not, for same is not necessary. *Enserch Corp. v. Parker*, 794 S.W.2d at 7-8; *Verson Allsteel Press Co. v. Carrier Corp.*, 718 S.W.2d at 302-303. So, as in *Enserch*, *Verson*, and *Faulk*, "the indemnity language in the contract between" LLC and KK "is sufficient to show that . . . [KK] expressly assumed liability for injuries to its own employees." *Enserch Corp. v. Parker*, 794 S.W.2d at 8. Yet, this does not end our inquiry.

> b.      *Indemnity and/or Contribution Under Paragraph 11.7*

We next assess the scope of paragraph 11.7. In doing so, we immediately note that nothing therein expressly mentions contribution or KK's duty to contribute to the payment of any award. Rather, the clause specifically obligates KK to "indemnify, hold harmless, and defend" LLC. This is of moment because contribution and indemnity are distinct concepts. The former connotes, as stated by the Texas Supreme Court long ago, a proration of liability among joint tortfeasors. *Gulf, C. & S. F. Co. v. Galveston, H. & S. A. Co.*, 18 S.W. 956, 958-59 (Tex. 1892). On the other hand, it is commonly understood that indemnity involves a shift in responsibility for payment of damages, *Whitson v. Goodbody's, Inc.*, 773 S.W.2d 381, 382-83 (Tex. App.--Dallas 1989, writ denied), whereby one pays the entire amount due by another. *Gulf, C. & S. F. Co. v. Galveston, H. & S. A. Co.*, 18 S.W. at 958-59. We conclude, for several reasons, that indemnification (as the term is commonly understood) rather than contribution was what was intended by the parties to the subcontract.

First, the words "indemnify, hold harmless, and defend," when read together, evince an intent to completely shift the entire responsibility for payment to another. Nothing in the paragraph qualifies their scope once the duty to indemnify, hold harmless and defend is triggered. Second, according to paragraph 11.7, the duty arises when, among other things, the injury contemplated is caused by KK, in whole and part, and "regardless of whether it . . . [was] caused in part by a party indemnified hereunder." In other words, KK is allegedly bound to reimburse LLC even for injuries LLC caused, as long as KK also caused them in part. Simply put, there is no proration under these terms; instead, the subcontractor is ultimately responsible for reimbursing LLC for everything. These indicia compel us to hold that the obligation undertaken by KK was nothing short of pure indemnification, as opposed to contribution or some mix of contribution and indemnity.

So, because the subcontract says nothing about contribution and its terms evince nothing of an intent to obligate KK to provide contribution, the only potential right of contribution available to LLC would be that existent outside of the subcontract. Nonetheless, LLC remains without succor in that circumstance, given *Varela*, which negates the availability of all forms of non-contractual contribution in cases like that at bar. *See Dresser Indus., Inc. v. Lee*, 880 S.W.2d 750, 752 (Tex. 1993) (reaffirming the proposition that a third-party cannot seek contribution from a subscribing employer to reduce the third-party's responsibility to the employee). Therefore, and as a matter of law, LLC had no right of contribution to assert via its cross-claim against KK, and the trial court did not err in entering summary judgment denying LLC recovery upon the claim.

35

As to the matter of indemnity, we note the absence of any language expressing the intent, through specific words, that KK would hold LLC harmless from injuries caused by LLC's own negligence. This is required before same can occur. As said by the Supreme Court in *Ethyl Corporation v. Daniel Construction Company*, "parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms." 725 S.W.2d 705, 708 (Tex. 1987); *Enserch Corp. v. Parker*, 794 S.W.2d at 8 (reaffirming this principle, which is known as the express negligence rule). Because paragraph 11.7 said nothing specifically about the negligence of LLC, the express negligence rule was not satisfied. This, in turn, prevented LLC from obtaining indemnity for injuries it caused in whole or part.[13] Thus, the trial court did not err in denying LLC indemnification from KK for injuries arising from LLC's actions.

Finally, we reject the suggestion of LLC that it was not attempting to recover indemnity for the consequences of its own acts. The suggestion contradicts the allegations in its cross-claim, where it averred that 1) "[s]hould . . . a jury find *any* negligence, then Lee Lewis Construction is entitled to indemnity from KK Glass" and 2)

---

[13]Though no case we have found clearly states it, we nevertheless interpret *Ethyl* and its progeny as requiring the parties to actually include the word "negligence" or some synonym thereof in the indemnification agreement before the express negligence rule is satisfied. We gather this from that portion of *Ethyl* wherein the Supreme Court admonished parties to evince the pivotal intent through "specific terms." *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 708 (Tex. 1987); *see Houston Lighting & Power Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 890 S.W.2d 455, 457-59 (Tex. 1994) (applying the express negligence rule to indemnification for claims involving strict liability and holding that the rule was not satisfied because the parties did not mention the intent to cover strict liability in "specific terms"). So too is this interpretation of the rule the only way in which the holdings of such cases as *Glendale Constr. Servs., Inc. v. Accurate Air Sys., Inc.*, 902 S.W.2d 536 (Tex. App.--Houston [1st Dist.] 1995, writ denied), can be explained. In *Glendale*, the parties contemplated indemnification even for injuries caused by the indemnitee. Yet, the word "negligence" went unmentioned. One would think that obligating the indemnitor to reimburse the indemnitee for injuries caused by the indemnitee would be sufficient indication of an intent to include the negligence of the indemnitee. But, the court said no and we can only explain it by concluding that the word "negligence" must be stated.

"KK Glass should be obligated to defend Lee Lewis Construction and to pay for *any and all damages* awarded in this case." (emphasis added). In referring to "any" negligence and "any and all damages," LLC clearly wanted KK to pay for everything. In wanting KK to pay for everything, it could hardly be said under any rational interpretation of the pleading that LLC wanted KK to reimburse it only for the damages caused solely by KK.

In addition, since paragraph 11.7 fails to satisfy the express negligence rule, LLC could not seek indemnification for injuries concurrently caused by LLC and KK. Such right of recovery is known as comparative indemnity and must arise via contract satisfying the express negligence rule. *Enserch Corp. v. Parker*, 794 S.W.2d at 8; *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d at 707. This left LLC to recovering for injuries solely caused by KK. Yet, matters of sole causation are not the stuff of cross-claims. Rather, they are defensive issues invoked to prevent a plaintiff from recovering against the one asserting that the injuries were solely caused by someone or something else. Indeed, if the injuries at bar were solely caused by KK, then there would be no need for LLC to obtain indemnity, for they could not have been charged against LLC.

Accordingly, the summary judgment granted KK Glass is affirmed. Next, the court suggests, under Texas Rule of Appellate Procedure 46.3, that the $500,000 award recompensing Jimmy Harrison for pain, suffering and mental anguish be remitted by $450,000. Should the sum not be remitted, the judgment (save for the summary judgment granted KK Glass) will be reversed. Should remittitur be timely filed, the judgment will be reformed and affirmed as reformed.

37

Brian Quinn
Justice

Publish.