COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LAS PALMAS MEDICAL CENTER AND EL PASO HEALTHCARE SYSTEM, LTD. D/B/A LAS PALMAS MEDICAL CENTER, | § § § § | No. 08-07-00016-CV Appeal from the |
| Appellant, | § | 210th District Court |
| v. | § | of El Paso County, Texas |
| FERNANDO RODRIGUEZ, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CARMEN RODRIGUEZ, DECEASED, | § § § | (TC# 2003-3772) |
| Appellee. | | |

**O P I N I O N**

This is an appeal from a judgment awarding money damages in a medical malpractice case. Appellee Fernando Rodriguez (Rodriguez) brought a wrongful death and survival action against Appellant Las Palmas Medical Center and El Paso Healthcare System, Ltd. d/b/a Las Palmas Medical Center (Las Palmas), alleging negligence which caused the death of his mother, Carmen Rodriguez. After the first trial of the case, the trial court granted a motion for mistrial and ordered a new trial. Following the second trial, the jury found that Las Palmas's negligence proximately caused Carmen Rodriguez's death and awarded her son $50,000 damages for her conscious physical pain, $50,000 for her mental anguish, and $10,000 for her burial expenses. No damages were awarded for Fernando Rodriguez's individual wrongful death claim. The trial court reduced the damage claim for the burial expenses, but otherwise rendered judgment on the jury's verdict. We affirm.

Carmen Rodriguez suffered from a number of medical ailments including diabetes and

hypertension. She had suffered several strokes and had undergone surgery for a broken hip. She had also suffered from severe decubitus ulcers. On October 17, 2001, she was admitted to Las Palmas Medical Center in order to receive oxygen treatments due to a decubitus ulcer on her hip, and to receive treatment for an infection in the wound on her hip. There was evidence that she was awake, but she was not able to follow recommendations or verbal commands. However, there was also testimony from her son that she was coherent and was able to converse with him on the evening before her passing.

At 9:54 a.m. on October 23, 2001, after Carmen Rodriguez had returned from receiving hyperbaric oxygen treatment, she was scheduled to have a surgical procedure performed that afternoon. The patient's medical chart indicates that Nurse Majorie Day, Rodriguez's assigned nurse, performed an assessment of Rodriguez. She was not alert, oriented or talking, but her condition was stable. She was moaning, but her breathing was not labored. Rodriguez was suffering from dysphagia, a difficulty with swallowing.

At 10:30, Day noted that Rodriguez had a large amount of drainage from her wound, and she changed the dressings. At 11:30 a.m., Day was cleaning Rodriguez's mouth when she stopped breathing. Her heart was still beating. The medical chart indicates that Day called a "code." Her heart rhythm was at a slow rate of 40 per minute. Rodriguez's code status was "full code," indicating that she was to be resuscitated in the event of cardiac or respiratory arrest. Day testified that she did not recall what occurred during the code. Furthermore, there is no documentation in the hospital's records of the details of what occurred during the code. The medical records indicate that the code was stopped by order of Dr. Omar Gonzalez, the attending physician. Rodriguez continued to have "agonal" respirations until 12 p.m., when she was

2

pronounced dead. Her death was caused by two mucus plugs in her lungs. Day testified that her decision not to resuscitate Rodriguez was a violation of hospital policy and was a breach of the standard of care; although she believed the decision not to resuscitate was made by the family as Dr. Gonzalez had told her the family had decided not to resuscitate. The hospital policy did not permit the acceptance of a DNR order over the telephone.

Dr. Gonzalez testified that Day called him to tell him that Rodriguez had stopped breathing, and he instructed her to give him some time to request a DNR, or, do not resuscitate order. He then phoned Fernando Rodriguez and obtained his agreement not to resuscitate his mother. He called Day back and told her not to run the code. He believed that Rodriguez's condition was terminal or irreversible as she had multiple conditions contributing to her morbidity.

Fernando Rodriguez testified that he did not receive the call from Dr. Gonzalez, and he was unaware that his mother had stopped breathing until he received a call from the hospital informing him that his mother had passed away.

Rodriguez's chart indicates that when the code was stopped, her heart was still beating. Her respiration continued until 12. She was trying to breathe for forty minutes. Her respirations were agonal.

Various experts testified on behalf of both parties. Nurse Cynthia Stinson testified the nursing care at Las Palmas failed to meet the standard of care due to lack of documentation regarding the purported change in her code status, the failure to document the respiratory care, the failure to document what measures were taken when the code was called, and the failure to follow hospital policy when the telephonic order to stop the code was received.

3

Nurse Stinson stated that she had no personal knowledge of what occurred in that she was not present when Rodriguez stopped breathing; although the nursing notes indicated that her breathing was agonal; that is, she was struggling to breathe. A person in such a circumstance is often gasping for breath, is bluish in color, and often has a helpless look in their eyes. A person utilizing agonal breathing is trying to breathe.

Dr. Hugh Poindexter testified as an expert for Rodriguez. He agreed that the nursing staff breached the standard of care in treating Rodriguez, and that their failure to take resuscitative measures proximately caused her death due to a mucus plug that developed because she did not have a gag reflex. Regarding whether or not Rodriguez was conscious after she stopped breathing, the following exchange occurred:

DEFENSE: Is it also true that you can't say within reasonable medical probability that Ms. Rodriguez was conscious at any time after the code was called and before her respirations stopped?

WITNESS: We discussed that before, and without documentation I just don't know. Trying to breathe, I would assume she was conscious but I would just have to assume.

DEFENSE: It's merely an assumption?

WITNESS: Assumption.

DEFENSE: And you cannot say within reasonable medical probability she was conscious at all during that period of time?

WITNESS: If you're trying to breathe I think it's a pretty good assumption that she probably was conscious.

DEFENSE: Well, can you say that with reasonable medical probability, Doctor?

WITNESS: I think so.

4

DEFENSE: You told me before you couldn't, wasn't that true?

WITNESS: I said it was possible. I think I gave you 50/50 on that one, too.

DEFENSE: I asked you on page 144.

WITNESS: Okay.

DEFENSE: So, and reasonable medical probability you can't say she was conscious during any of that period of time. Answer: They didn't document anything. Sometimes they can be conscious, sometimes not. There's nothing documented so we don't know in this case. We do not know that she was trying to breathe–we do know she was trying to breathe, though. Correct?

WITNESS: Yes, sir.

DEFENSE: You're not changing your answer today? You don't know?

WITNESS: I think it's about the same thing I said. I hope.

DEFENSE: We breathe while we're sleeping but we're not conscious?

WITNESS: Well , we're not comatose.

DEFENSE: But we're not conscious, are we?

WITNESS: There's controversy about that. How do we describe that? We just say it's a sleeping state.

Dr. Michael Robertson testified for Las Palmas. He stated that persons experiencing agonal breathing are not necessarily conscious. Dr. Robertson testified that in the instant case, Rodriguez's blood pressure was low at 40 over 0. He stated that it was incredibly unlikely that Rodriguez was conscious because it was unlikely a person with systolic pressure less than 70 was getting enough blood flow to the brain to cause her to be aware of anything.

In two issues, Las Palmas asserts that the evidence was legally insufficient to establish that Rodriguez was conscious for the purpose of an award of damages for the decedent's

5

conscious physical pain and mental anguish. An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). Contrary evidence may not be disregarded in sufficiency reviews under the first, second, and fourth circumstances. *See id.* at 810-11. In conducting our review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id*. at 822. Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish so long as more than one inference is possible. *Id.* at 821. But if the evidence allows only one inference, neither jurors nor the reviewing court may disregard it. *Id*. at 822. We are also mindful that jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. When there is conflicting evidence, it is the province of the jury to resolve such conflicts. *Id*. at 820. In every circumstance in which reasonable jurors could resolve conflicting evidence either way, the reviewing court must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review. *Id*. at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id*. at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *Id.* The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

Under Texas law, only pain that is consciously suffered and experienced by the deceased is compensable. *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 248 (Tex.App.–Texarkana 2005, no pet.); *Lee Lewis Construction, Inc. v. Harrison,* 64 S.W.3d 1, 14 (Tex.App.–Amarillo 1999), *aff'd*, 70 S.W.3d 778 (Tex. 2001). Also, its existence may be established by circumstantial evidence, *SunBridge Healthcare Corp.,* 160 S.W.3d at 248. Though not unbridled, a jury's discretion in considering the evidence and arriving at a justifiable sum is great. *Lee Lewis Construction, Inc.*, 64 S.W.3d at 14. Consciousness of pain and suffering may be established by expert opinion testimony. *See Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420, 1428 (5th Cir. 1992)(applying Texas law).

In the instant case, the jury was instructed that "pain and mental anguish" meant "the conscious physical pain and emotional pain, torment, and suffering experienced by Carmen Rodriguez before her death . . . ."

Appellant contends that consciousness is synonymous with "awareness." Accordingly, Appellant reasons that absent awareness of one's condition or circumstance, there can be no contemplation of one's condition or a sensation of pain. Appellant asserts that Dr. Poindexter's and Nurse Stinson's reliance upon evidence that Rodriguez was trying to breath and experienced agonal respirations cannot support an inference that she was conscious. Furthermore, Appellant contends that Dr. Poindexter's testimony that his assumption that Rodriguez was conscious was a 50/50 proposition amounted to no evidence.

Dr. Poindexter testified at trial that he could say with a reasonable medical certainty that because Rodriguez was trying to breathe, she was conscious. While his testimony is ambiguous in light of his deposition testimony, the resolution of this conflict was within the province of the

7

jury. *See Yanez v. Byrnes,* 480 S.W.2d 241, 244 (Tex.Civ.App.–El Paso 1972, no writ). Furthermore, there is authority for the proposition that taking agonal breaths clearly indicates one is suffering pain at the time. *Phillips v. Bramlett,* 258 S.W.3d 158, 172 (Tex.App.–Amarillo 2007, pet. granted). We find that Dr. Poindexter's testimony coupled with the testimony of the nurse expert concerning the demeanor of one experiencing agonal breathing is legally sufficient to support the jury's award of damages. We overrule Appellant's issues.

We affirm the judgment of the trial court.

DAVID WELLINGTON CHEW, Chief Justice

January 30, 2009

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating