Opinion issued July 26, 2007














In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00988-CV






GILBANE BUILDING COMPANY AND ZURICH AMERICAN
INSURANCE COMPANY, Appellants


V.


KEYSTONE STRUCTURAL CONCRETE, LTD., Appellee






On Appeal from the 80th District Court

Harris County, Texas

Trial Court Cause No. 2003-22167






O P I N I O N


 Appellants, Gilbane Building Company and Zurich American Insurance
Company (collectively "Gilbane" or "appellants") appeal the trial court's order that
granted summary judgment in favor of appellee, Keystone Structural Concrete LTD.
("Keystone"). In five issues on appeal, appellants assert that the trial court (1)
incorrectly granted Keystone's summary judgment on its contractual indemnity claim;
(2) incorrectly granted Keystone's summary judgment on Gilbane's breach of contract
claims; (3) improperly refused to reform the contract between Gilbane and Keystone;
and (4) improperly granted summary judgment on Gilbane's claim that Keystone
failed in its duty to advise Gilbane of the existence of another insurance policy. 
Alternatively, Gilbane argues that the trial court improperly granted summary
judgment based on ripeness instead of abating the claim, allowing an amendment of
the claim, or dismissing the claim without prejudice.

 We affirm.

Background


 Gilbane and Keystone contracted for Keystone to act as a subcontractor on a
construction project that Gilbane was performing at Rice University. During
construction, Victor Nava, an employee of Keystone, suffered an injury and brought
suit alleging negligence against Gilbane only. (1) Nava settled his suit for $2,000,000
of which Admiral Insurance, Keystone's primary carrier, paid the first million. (2) 
Gilbane's primary insurance carrier, Zurich, paid the second million of the
settlement. (3) 

 After Nava's settlement funded, Gilbane filed suit against Keystone and Royal
Insurance Company of America ("Royal Insurance"), Keystone's excess carrier,
seeking to recover the million dollars it paid to settle Nava's claim. (4) In its third
amended petition, and pertinent to this appeal, Gilbane asserted that Keystone was
liable for (1) breaching a contractual indemnity agreement in the Gilbane-Keystone
contract; (2) breaching the contractual provision that required Keystone to provide
insurance coverage of up to $6 million that would be primary to any coverage issued
to Gilbane for any loss arising out of Keystone's performance of the work under the
contract; and (3) breaching the contractual requirement that Keystone verify that all

construction equipment used was in a safe condition and that the work was performed
in compliance with the applicable safety rules, regulations, codes, ordinances and
statutes. Gilbane also sought reformation of its contract with Keystone if the trial
court did not agree that the contract expressed a specific intent that Keystone provide
Gilbane with liability coverage for negligence; and Gilbane contended that it was
damaged when Keystone failed to timely inform it that Northern Insurance Company
("Northern Insurance") had issued a policy to Keystone that would have covered
Nava's claim. 

 Keystone filed a motion for partial summary judgment and a no-evidence
motion for partial summary judgment. Gilbane filed a response. On July 18, 2005,
the trial court granted summary judgment to Keystone as to all the allegations against
Keystone asserted by Gilbane. Gilbane filed a motion for new trial or in the
alternative a motion to modify judgment. The motion for new trial was overruled by
operation of law.

Analysis


 In its first issue on appeal, Gilbane argues that the trial court incorrectly
granted Keystone's summary judgment on the contractual indemnity claim asserted
by Gilbane.

 Standard of Review

 Summary judgment is a question of law. Provident Life & Accident Ins. Co.
v. Knott, 128 S.W.3d 211, 220 (Tex. 2003). Thus, we review a trial court's summary
judgment decision de novo. Id. at 215. The standard of review for a traditional
summary judgment motion is threefold: (1) the movant must show that there is no
genuine issue of material fact and that he is entitled to judgment as a matter of law;
(2) in deciding whether there is a disputed, material fact issue precluding summary
judgment, the court must take evidence favorable to the nonmovant as true; and (3)
the court must indulge every reasonable inference in favor of the nonmovant and
resolve any doubts in the nonmovant's favor. Tex. R. Civ. P. 166a(c); Pustejovsky
v. Rapid-Am. Corp., 35 S.W.3d 643, 645-46 (Tex. 2000); Nixon v. Mr. Prop. Mgmt.
Co., 690 S.W.2d 546, 548-49 (Tex. 1985). A defendant seeking summary judgment
must, as a matter of law, negate at least one element of each of the plaintiff's theories
of recovery or plead and prove each element of an affirmative defense. Missouri Pac.
R.R. v. Lely Dev. Corp., 86 S.W.3d 787, 790 (Tex. App.--Austin 2002, pet. dism'd).

 A party moving for no-evidence summary judgment must assert only that there
is no evidence of one or more essential elements of a claim or defense on which the
non-movant would have the burden of proof at trial. See Tex. R. Civ. P. 166a(i). The
burden then shifts to the non-movant to produce evidence raising a fact issue on the
challenged elements. See id. A no-evidence summary judgment is improper if the
respondent brings forth more than a scintilla of probative evidence to raise a genuine
issue of material fact. Id.; Forbes Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167,
172 (Tex. 2003). Less than a scintilla of evidence exists when the evidence is so
weak as to do no more than create a mere surmise or suspicion of a fact. Forbes, 124
S.W.3d at 172. More than a scintilla of evidence exists if it would allow reasonable
and fair-minded people to differ in their conclusions. Id. As with a traditional
summary judgment, we view the evidence in the light most favorable to the
non-movant, disregarding all contrary evidence and inferences. King Ranch, Inc. v.
Chapman, 118 S.W.3d 742, 751 (Tex. 2003).

 If the trial court has granted summary judgment without specifying the ground
or grounds relied on for the ruling, summary judgment will be affirmed on appeal if
any of the theories advanced is meritorious. See State Farm Fire & Cas. Co. v. S.S.,
858 S.W.2d 374, 380 (Tex. 1993).

 Indemnity

 In its first issue on appeal, Gilbane argues that the "trial court incorrectly
granted Keystone's summary judgment on the contractual indemnity claim asserted
by Gilbane." Gilbane relies on the contractual indemnity provision found in the
Gilbane-Keystone contract, which states,

5.2 For ten ($10.00) dollars and other good and valuable consideration,
the receipt whereof is hereby acknowledged, and to the fullest extent
permitted by law, the Trade Contractor (Keystone) agrees to indemnify
and hold harmless, [Gilbane], the Owner, the Architect/Engineer and
all of their agents and employees from and against claims, damages,
losses and expenses, including but not limited to attorneys' fees arising
out of or resulting from the performance or failure in performance
of [Keystone's] work under this Agreement provided that any such
claim, damage, loss, or expense (1) is attributable to bodily injury,
sickness, disease, or death, or to injury to or destruction of tangible
property including the loss of use resulting therefrom, (2) is caused,
in whole or in part, by any negligent act or omission of [Keystone]
or anyone directly or indirectly employed by [Keystone], or anyone
for whose acts [Keystone] may be liable, regardless of whether
caused in part by a party indemnified hereunder. Such obligations
shall not be construed to negate, abridge, or otherwise reduce any other
right or obligation of indemnity which would otherwise exist as to any
party or person described in this paragraph. In any and all claims
against the Construction Manager (Gilbane), or any of its agents or
employees, by any employee of [Keystone], or anyone directly or
indirectly employed by [Keystone], or anyone for whose acts he may be
liable, the indemnification obligation under this paragraph 5.2 shall not
be limited in any way by any limitation on the amount or type of
damages, compensation, or benefits payable by or for [Keystone] under
worker's compensation acts, disability benefit acts, or other employee
benefit acts. 


 Gilbane argues that this provision "clearly expresses the agreement of the
parties that Keystone will indemnify Gilbane when Gilbane is subjected to a claim
that arose in whole or part by any negligent act or omission of Keystone which was
committed during the performance of Keystone's work under the contract." Gilbane
recognizes that the authorities cited by Keystone preclude Gilbane from recovering
for its own negligence, but it argues that the authorities do not address the situation
in which Gilbane is "able to establish that the incident involving Mr. Nava and the
resulting loss suffered by Gilbane was caused by the negligence of Keystone in whole
or part and not the negligence of Gilbane." Keystone responds that the contractual
indemnity provision is not enforceable because Gilbane was sued for its own
negligence, the indemnity provision does not expressly indemnify Gilbane for its own
negligence, and therefore, it does not comply with the express negligence test
mandated by Texas law. We agree with Keystone.

 Because indemnity provisions seek to shift the risk of one party's future
negligence to the other party, Texas imposes a fair notice requirement before
enforcing such agreements. Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d
505, 508 (Tex. 1993). The fair notice requirements are the express negligence
doctrine and the conspicuousness requirement. Storage & Processors, Inc. v. Reyes,
134 S.W.3d 190, 192 (Tex. 2004). Under the express negligence doctrine, an intent
to indemnify one of the parties from the consequences of its own negligence, "must
be specifically stated in the four corners of the document." Id. (quoting Ethyl Corp.
v. Daniel Constr. Co., 725 S.W.2d 705, 707 (Tex. 1987)). The conspicuousness
requirement mandates that "something must appear on the face of the [contract] to
attract the attention of a reasonable person when he looks at it." Id. (quoting Dresser,
853 S.W.2d at 508). Language is conspicuous if it appears in larger type, contrasting
colors, or otherwise calls attention to itself. Dresser, 853 S.W.2d at 511; see also
Tex. Bus. & Com. Code Ann. § 1.201(b)(10) (Vernon Supp. 2006). Whether an
agreement meets the conspicuous requirement is a question of law for the court. 
Dresser, 853 S.W.2d at 509. An agreement that does not "satisfy either of the fair
notice requirements when they are imposed is unenforceable as a matter of law." 
Reyes, 134 S.W.3d at 192. 

 In Glendale Construction Services, Inc. v. Accurate Air Systems, Inc., we held
that an indemnity agreement that used language substantially similar to the language
in the Gilbane-Keystone contract did not show an express agreement for the
contractor (here, Keystone) to indemnify the general contractor (here, Gilbane) for
the negligence of the general contractor's own negligence. 902 S.W.2d 536, 539
(Tex. App.--Houston [1st Dist.] 1995, writ denied). Here, only Gilbane was sued for
negligence; Keystone was not sued. Therefore, after reviewing the contractual
language used here, we conclude that the contractual language does not meet the
express negligence test because it does not expressly provide that Keystone will
indemnify Gilbane for Gilbane's own negligence. Thus, the contractual indemnity
provision is unenforceable. See Fisk Elec. Co. v. Constructors & Assocs., 888
S.W.2d 813, 815 (Tex. 1994) ("Either the indemnity agreement is clear and
enforceable or it is not."); Cabo Const. Inc. v. R.S. Clark Const. Inc.,
01-05-00487-CV, 2007 WL 1119936, at *4-5 (Tex. App.--Houston [1st Dist.] Apr.
12, 2007, no pet.).

 Gilbane argues, however, that it is not seeking to be indemnified for its own
negligence, but rather for Keystone's sole negligence in causing Nava's injuries. (5) 
Keystone does not respond to Gilbane's argument other than stating, "Gilbane's and
Zurich's argument that they should now be allowed to seek a determination regarding
the possible negligence of Keystone for the Nava settlement simply retards rather
than advances the policy of preventing satellite litigation regarding the interpretation
of indemnity contracts." We agree.

 This case is analogous to Fisk Electric Co. v. Constructors & Associates. 888
S.W.2d 813 (Tex. 1994). In Fisk, the trial court granted judgment in favor of the sub-contractor-indemnitor, Fisk, finding that the indemnity agreement did not satisfy the
express negligence test. Id. The court of appeals reversed, holding that to obtain
summary judgment and to avoid liability under the indemnity agreement, the
indemnitor must first establish the indemnitees' negligence. Id. The Texas Supreme
Court reversed the court of appeals, holding that "no obligation to indemnify an
indemnitee for the costs or expenses resulting from a claim made against it for its own
negligence arises unless the indemnification agreement complies with the express
negligence test." Id. at 813-14. The supreme court stated that an indemnity
agreement is "clear and enforceable or it is not" and that "[s]uch a determination
should not depend on the outcome of the underlying suit, but should be established
as a matter of law. . . ." Id. at 815. 

 In Fisk, the indemnitee argued that the indemnitor should have to pay defense
costs. The supreme court responded that the indemnitee's interpretation regarding
defense costs "would leave indemnitors liable for a cost resulting from a claim of
negligence which they did not agree to bear" and "would also leave indemnitors
vulnerable to indemnitees who might settle cases without admitting negligence,
leaving the indemnitor to pay the costs of settlement and defense." Id. The supreme
court also held that "[w]ithout an express reference in the indemnification provision
to claims based upon negligence, there is no indemnity for defense costs incurred in
connection with a negligence claim irrespective of whether the claim is ultimately
proved." Id. at 815-16. (6) 

 Here, Gilbane settled the case for $2 million dollars and now seeks indemnity
from Keystone, asserting that Keystone is solely liable for Nava's injuries. As the
Texas Supreme Court foreshadowed, Gilbane seeks to have Keystone pay for its
settlement. Id. at 815. To allow Gilbane to litigate the question of who caused
Nava's injuries post-settlement and without a valid indemnity agreement "retards
rather than advances the policy of preventing satellite litigation regarding
interpretation of indemnity contracts." Id. at 815 n.2. Because the Gilbane-Keystone
contract does not contain a valid indemnity agreement applicable to this case, we hold
that the trial court properly granted summary judgment on Gilbane's contractual
indemnity claim. 

 We overrule Gilbane's first issue on appeal.

 Breach of Contract

 In its second issue on appeal, Gilbane argues that the trial court incorrectly
granted summary judgment on its breach of contract cause of action. Specifically,
Gilbane contends that Keystone breached the Gilbane-Keystone contract by failing
to require its excess carrier, Royal Insurance, to provide coverage that was primary
to the policy issued by Zurich to Gilbane.

 Absent ambiguity, we interpret a contract as a matter of law. DeWitt County
Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999). "Whether a contract is
ambiguous is a question of law that must be decided by examining the contract as a
whole in light of the circumstances present when the contract was entered." 
Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex.
1996). "If the written instrument is so worded that it can be given a certain or definite
legal meaning or interpretation, then it is not ambiguous and the court will construe
the contract as a matter of law." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). 
"An ambiguity exists only if the contract language is susceptible to two or more
reasonable interpretations." Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154,
157 (Tex. 2003). The language in a contract is to be given its plain grammatical
meaning unless doing so would defeat the parties' intent. DeWitt County Elec. Coop.,
1 S.W.3d at 101. We presume that the parties intended every clause to have an effect. 
Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996).

 Schedule "A" of the Gilbane-Keystone contract is entitled, "Insurance
Specifications." The specifications state, 

Gilbane Building Company and William Marsh Rice University are each
to be named as an "Additional Insured" on all Liability Insurance.


Provide Waiver of Subrogation on all divisions of Liability Coverage in
favor of Gilbane Building Company and William Marsh Rice University


Commercial General Liability to be provided on an 'occurrence' basis,
with coverage to include explosion, collapse and underground hazards
. . . Blanket Contractual, Products Independent Contractors, Completed
Operations, Personal Injury, and employees as additional insured.


Bodily Injury Limits: $1,000,000 each occurrence. $1,000,000
aggregate.


Personal Injury Limits: $1,000,000 each occurrence. $1,000,000
aggregate.


Aggregate shall apply to this project only . . . and must be identified as
such on the certificate of insurance.


Excess Umbrella Liability, to provide insurance in excess of Employers'
Liability, Commercial General Liability, and Automobile Liability
policies required hereunder: $5,000,000 each occurrence and $5,000,000
general policy aggregate. 


 Gilbane contends that the overall intent of the insurance specifications required
protection for Gilbane "up to the minimum amount of $6,000,000 before Gilbane or
its insurance carrier should have to respond to claims asserted against Gilbane for
accidents arising out of Keystone's performance or lack of performance of their
contract." 

 Keystone responds that Gilbane failed to specify that Keystone's insurance
would be primary to Gilbane's insurance and that nothing in the contract "required
Keystone to secure an umbrella insurance policy that would have priority over
Gilbane's other insurance with respect to claims arising out of the [contract]." We
agree.

 Although the insurance specifications require Keystone to maintain an
umbrella policy in the amount of $5 million, the contract does not specify the
priorities between Keystone's insurance and any other insurance. To interpret the
contract under Gilbane's analysis, we would have to add a provision stating that the
umbrella policy would be primary to Gilbane's insurance. We decline to do so. 
Parties should be held to the contract that they drafted. See Lambert v. Affiliated
Foods, Inc., 20 S.W.3d 1, 6 (Tex. App.--Amarillo 1999), aff'd, 44 S.W.3d 544 (Tex.
2001) (stating courts are not permitted to draft new contract between parties,
"regardless of whether one or more of the parties contracted wisely or foolishly, or
created a hardship for himself"). Here, it is undisputed that Gilbane drafted the
Gilbane-Keystone contract and the insurance specifications. Thus, because the
insurance specifications do not require Keystone's umbrella policy to be primary
insurance above any and all additional insurance, Keystone did not breach its
agreement to obtain excess insurance in the amount of $5 million dollars. 
Accordingly, the trial court properly granted summary judgment on Gilbane's breach
of contract cause of action.

 Gilbane next argues that if we adopt Keystone's interpretation of the contract,
we would have to ignore the waiver of subrogation clause, the requirement that
Keystone provide excess coverage, and the additional insured requirements in the
contract. 

 "Subrogation" is the right of one who has paid an obligation that another
should have paid to be indemnified by the other. Texas Ass'n of Sch. Bds., Inc. v.
Ward, 18 S.W.3d 256, 258 (Tex. App.--Waco 2001, pet. denied). The object of such
subrogation is to prevent the insured from receiving a double recovery. Argonaut Ins.
Co. v. Allstate Ins. Co., 869 S.W.2d 537, 541 (Tex. App.--Corpus Christi 1993, writ
denied). An insurer's right to subrogation derives from the rights of the insured and
is limited to those rights. Interstate Fire Ins. Co. v. First Tape, Inc., 817 S.W.2d 142,
145 (Tex. App.--Houston [1st Dist.] 1991, writ denied). A release between the
insured and an offending party prior to a loss destroys the insurance company's rights
by way of subrogation. Id.

 We fail to see how Gilbane's negotiation of the waiver of subrogation right
meant that Keystone's excess insurance would be primary to Gilbane's insurance. (7) 
Instead of implying the meaning of the contract based on various clauses, we construe
the contract pursuant to its plain meaning. Here, the contract does not provide for the
priority of insurance. Also, subrogation is based on receiving indemnity from another
party. Here, we have already determined that the Gilbane-Keystone contract did not
contain an enforceable indemnity agreement.

 Gilbane also argues that because the insurance specifications required
Keystone to name Gilbane as an additional insured on all insurance policies, such
requirement expresses the intent that "Gilbane be protected by Royal's excess
coverage before looking to Gilbane's coverage." Gilbane cites no authority for the
proposition that being named as an additional insured means that the insurance policy
will be primary to all other insurance. As Keystone aptly points out, had Nava's
claims been for $4 million dollars, the primary policies would have been exhausted
and the excess coverage would have been available. We disagree that a requirement
for Keystone to name Gilbane as an additional insured automatically means that any
insurance coverage obtained by Keystone would be primary to insurance procured by
Gilbane. (8)

 We overrule Gilbane's second issue on appeal.

 Reformation of Contract

 In its third issue on appeal, Gilbane argues that the trial court erred by refusing
to reform the contract to reflect the parties' intent that Keystone would provide
"insurance coverage up to at least the sum of $6 million that was primary to any
insurance policy issued directly to Gilbane for losses arising out of the work
performed by Keystone."

 Gilbane argues that the parties intended that coverage provided by Keystone
would be primary to Gilbane's own coverage up to at least $6 million. Gilbane relies
on the testimony of Scott Anderson, the Vice-President and General Manager of
Keystone, and Marshal Lightman, the Vice-President and Regional Controller for
Gilbane, to establish that coverage provided by Keystone would be primary to
Gilbane's own coverage.

 If a written contract fails to reflect a party's original agreement due to a mutual
mistake, the court may reform the contract to properly reflect the party's true
agreement. See Cherokee Water Co. v. Forderhause, 741 S.W.2d 377, 379 (Tex.
1987). In St. Paul Fire & Marine Ins. Co. v. Culwell, the court stated, 

Equity has jurisdiction to reform written instruments in cases of mutual
mistake, but a written contract will not be reformed in equity because of
a mistake, in the absence of fraud, unless it is mutual; that is, common
to both parties, and each under the same mistake as to its terms.


62 S.W.2d 100, 101 (Tex. Comm'n App. 1933, judgm't adopted). "Knowledge by
one party of the other's mistake regarding the expression of the contract is equivalent
to mutual mistake." Warren v. Osborne, 154 S.W.2d 944, 946 (Tex. Civ.
App.--Texarkana 1941, writ ref'd w.o.m.) (quoting Williston on Contracts, Vol.
III, 2745). Gilbane relies on the testimony of Scott Anderson and Lightman to
establish mutual mistake. Anderson testified to the following by deposition:

 Q. Did you have any conversations, during the process of
bidding the job at Rice University or in entering the
contract with anybody from . . . Gilbane about what the
insurance requirements were?

 

 A. No, at no time did I discuss insurance with Gilbane.


 Q. Were there insurance requirements contained in these
specifications, if you recall?

 

 A. As I recall, there were insurance requirements at the time
we looked at the project.

 

 Q. What is your recollection of what those insurance
requirements were, if you have one?

 

 A. As best I can recall, it required about a million dollars of
coverage through our normal general liability, and then it
had an umbrella requirement. I do not remember the
number, but it was probably several million dollars more,
umbrella coverage beyond the $1 million.

 

 . . . 

 

 Q. Do you recall whether or not there was any issue or
designation as to whether or not that umbrella was to be
primary to any insurance that Gilbane had?


 A. No.


 Q. Okay. And let me ask it--clarify the question. When you
say no, do you mean you recall that, or you do not believe
that it was required, the primary?

 

 A. There was no conversation that our insurance would be
primary. The insurance was whatever was stated in the
documents is all that I know.

 

 Q. Okay. Well, what was your understanding?


 A. My understanding is that typically the general contractor,
that is what they were trying to accomplish.

 

 Q. Okay. 

 

 A. However, in this particular instance, I feel the documents
were ambiguous enough that that may not have been
accomplished through what they presented and what we all
signed. And at no time did we actually discuss insurance
requirements with Gilbane.


 Q. So, your understanding was that that would ordinarily be
what was required, but you didn't feel like the documents
were clear enough to express that intent?

 

 A. I believe that typically the general contractor, trying to
limit his risk, would try and do that.

 

 Q. Okay.

 

 A. In this case, I believe that the documents are not
necessarily specific enough that that would happen. 
Beyond that is a matter with the insurance companies and
you all can decide what it is.

 

 Q. Okay.

 

 A. But I felt that there was some ambiguity and it did not do
any harm to my position, as far as managing risk, to sign
the documents as they were.

 

 Q. Okay. So, you had that belief even at the time that the
contract documents were being signed.

 

 A. That is correct.

 

 Q. Okay. And you were not clear one way or the other
whether or not they expressed that intent, that your
insurance would be primary, correct?

 

 A. Let me make sure I get this right. I believe that our general
liability policy would have been the primary coverage at
first. And beyond that, I do not know which would be
covered because, as I said before, I felt the documents had
some measure of ambiguity to them that did not hurt my
risk management as the project manager or as the vice
president of the company.

 

 Q. You felt it could have gone either way but you didn't--

 

 A. That's correct.

 

 Q. And you didn't do anything to clarify that?

 

 A. That is correct.

 

 Q. You didn't contact Gilbane to see what their intent was?

 

 A. No, sir. 


 Marshal Lightman, testified by affidavit that 

 It is Gilbane's general practice and it was the intent as to the
Keystone Structural Concrete contract that Keystone Structural
Concrete provide liability insurance coverage up to sum of $6
million dollars and that such coverage name Gilbane as an
additional insured and provide that the $6 million in coverage be
primary to Gilbane's insurance coverage for any loss arising out
of the work of Keystone Structural Concrete. 


 Keystone responds that the testimony of Anderson and Lightman provides no
evidence that would require the trial court to reform the contract. We agree. Neither
Anderson's testimony nor Lightman's testimony shows that the parties discussed
primary insurance and agreed that Keystone's excess insurance would be primary to
Gilbane's insurance. Thus, Gilbane presented no evidence of a mutual mistake, and
the trial court properly granted summary judgment on Gilbane's contract reformation
argument.

 We overrule Gilbane's third issue on appeal.

 Additional Breach of Contract Cause of Action

 In its fourth issue on appeal, Gilbane argues that the trial court improperly
granted summary judgment on its breach of contract cause of action. Specifically,
Gilbane argues that Keystone breached its contractual obligations to "make sure that
the equipment Keystone Structural Concrete used was in a safe condition and that
Keystone Structural Concrete performed its duties in compliance with all applicable
regulations, codes, ordinances, and statutes and that such breach resulted in damages
to Gilbane in the form of the claim of Mr. Nava." 

 In the Gilbane-Keystone contract, Keystone agreed to the following provisions:

 9.5 The Trade Contractor agrees to adhere to the federal
occupational safety act, state and local safety regulations
and the Construction Manager's safety and health program
so as to avoid injury or damage to persons or property, and
to be directly responsible for damage to persons and
property resulting from failure to do so.


 9.15 The Trade Contractor shall insure that all construction
tools, equipment, temporary facilities, and other items used
in accomplishing the work, whether purchased, rented, or
otherwise provided by the Trade Contractor or provided by
others, are in a safe, sound, and good condition [and] must
be capable of performing the functions for which they are
intended and must be maintained in conformance with
applicable laws and regulations.

 

 Gilbane contends that "Keystone assumed any responsibilities that Gilbane
may have had to comply with safety requirements, including the provision of a safe
place for Mr. Nava to work and safe tools and equipment for Mr. Nava to use in the
performance of his work." Gilbane further contends that:

To the extent that Mr. Nava's injuries were caused in whole or part by
any of the [allegations in Nava's petition against Gilbane], the
responsibilities for performing those duties to Mr. Nava had been
exclusively assumed by Keystone pursuant to [provisions 9.5 and 9.15]. 
By failing to perform those contractual obligations, Keystone breached
its contract with Gilbane. 


 Keystone responds that Gilbane's cause of action for breach of the contractual
provisions is just another way of pursuing its indemnity claim. Keystone also argues
that regardless of how Gilbane refers to the claim, section 417.004 of the Texas Labor
Code bars Gilbane's recovery. Section 417.004 provides,

 In an action for damages brought by an injured employee, a legal
beneficiary, or an insurance carrier against a third party liable to
pay damages for the injury or death under the chapter that results
in a judgment against the third party or a settlement by the third
party, the employer is not liable to the third party for
reimbursement or damages based on the judgment or settlement
unless the employer executed, before the injury or death occurred,
a written agreement with the third party to assume the liability.


Tex. Lab. Code Ann. § 417.004 (Vernon 2006). 

 The Texas Supreme Court has stated that section 417.004 "prohibits indemnity
in a workers' compensation context unless one party expressly agrees to indemnify
the other in writing." Enserch v. Parker, 794 S.W.2d 2, 7 (Tex. 1990) (emphasis
omitted). The indemnity agreement here is unenforceable because it fails to comply
with the express negligence rule. See id. Accordingly, we hold that section 417.004
bars Gilbane's breach of contract claims against Keystone.

 We overrule appellants' fourth issue on appeal.

 Duty to Inform

 In its fifth issue on appeal, Gilbane argues that the trial court improperly
granted summary judgment on its claim that Keystone had a duty to, but failed to
advise Gilbane of the existence of the Northern Insurance Company of New York
("Northern Insurance") policy under which Gilbane was an additional insured. 
Alternatively, Gilbane argues that the trial court improperly granted summary
judgment on this claim based on Keystone's contention that the claim was not ripe. 

 The Gilbane-Keystone contract required Keystone to secure $1 million in
insurance and $5 million in excess insurance. Pursuant to the contract, Keystone
secured a policy from Admiral Insurance for $1 million and secured $5 million in an
umbrella policy. Although not stated in the Gilbane-Keystone contract, Keystone
secured an additional $1 million in insurance from Northern Insurance. 

 In its supplemental motion for summary judgment, Keystone argued that
Gilbane's loss of coverage complaint was not ripe because Northern had not yet
denied coverage and that Keystone had no duty to inform Gilbane of the Northern
Insurance. Gilbane responded that Keystone had a duty to inform it about the
Northern Insurance because the insurance specifications stated that Gilbane would
be named as an insured on all insurance policies and that to have that requirement
without the corresponding duty to inform Gilbane about the insurance would "fly in
the face of common sense." 

 Gilbane cites no authority for its argument that Keystone had a "duty" to
inform it of the additional insurance. See Tex. R. App. P. 38.1(h). Furthermore, the
insurance specifications are silent regarding whether Keystone is required to inform
Gilbane of all insurance that Keystone procures. The insurance specifications state
that Keystone will "furnish certificates of insurance with Gilbane Building
Company's project name and number stated on the certificates and submit prior to the
beginning of on-site operations." Keystone complied with this requirement in that
the insurance specifications require, at a minimum, $1 million in commercial general
liability insurance and $5 million in an excess umbrella liability policy. 

 Gilbane argues in its reply brief, however, that the insurance specifications
required more than the $1 million in primary coverage and $5 million in excess
coverage that Keystone had to obtain before it could begin on-site operations. 
Gilbane's argument is undermined by the underlying facts in that it is undisputed that
Keystone submitted certificates of insurance with the minimum amounts listed above
that named Gilbane as an additional insured and that, thereupon, Gilbane allowed
Keystone to start the on-site operations. Thus, we disagree with Gilbane's argument
that more insurance was required by Keystone. 

 Because the contract did not require Keystone to inform Gilbane of the
Northern Insurance policy and Gilbane cites no authority to the contrary, the trial
court properly granted summary judgment on Gilbane's loss of coverage cause of
action. (9)

Conclusion


 We affirm the judgment of the trial court.





 Evelyn V. Keyes

 Justice


Panel consists of Justices Nuchia, Keyes, and Higley.

1. Section 408.001 of the Texas Labor Code precluded Nava from bringing suit against
his employer, Keystone. See Tex. Lab. Code Ann. § 408.001 (Vernon 2006)
(providing that "workers' compensation benefits is the exclusive remedy of an
employee covered by workers' compensation insurance coverage . . . against the
employer . . . for the death of or a work-related injury sustained by the employee"). 
The parties do not dispute that Keystone provided workers' compensation benefits to
Nava.
2. Admiral Insurance provided a defense to Gilbane. 
3. Gilbane had to pay a $250,000 deductible. 
4. On February 18, 2005, the trial court granted Gilbane's and Zurich's Motion for
Dismissal of Royal Insurance Company of America without prejudice. Thus, Royal
Insurance is not a party to this appeal. 
5. Keystone responds that Gilbane seeks comparative indemnity which it cannot recover. 
Comparative indemnity must arise from a contract that satisfies the express
negligence rule. See Ethyl Corp. v. Daniel Constr. Co., 725 S.W.2d 705, 708-09
(Tex. 1987) (stating that "Parties may contract for comparative indemnity so long as
they comply with the express negligence doctrine. . . ."); Lee Lewis Constr., Inc. v.
Harrison, 64 S.W.3d 1 (Tex. App.--Amarillo 1999), aff'd on other grounds, 70
S.W.3d 778 (Tex. 2001). To the extent that Gilbane is trying to rely on comparative
indemnity to recover from Keystone, Gilbane loses on this point because the
indemnity agreement does not satisfy the express negligence rule. 
6. The supreme court noted that the indemnitees admitted that "if the plaintiff in the
underlying suit were successful, [the indemnitor] would not be obligated to pay
anything to [the indemnitee] because the agreement fails to satisfy the express
negligence test." Fisk Elec. Co. v. Constructors & Assocs., 888 S.W.2d 813, 815
(Tex. 1994). 
7. Gilbane cites no authority for its argument. See Tex. R. App. P. 38.1(h).
8. Gilbane cites no authority for its argument. See id.
9. Because we conclude that the trial court properly granted summary judgment on
Gilbane's duty-to-inform issue, it is unnecessary to address its alternative argument
that the trial court erred in granting summary judgment on its loss-of-coverage issue
based upon a "lack of ripeness." See Tex. R. App. P. 47.1.