Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio


# MEMORANDUM OPINION

No. 04-09-00320-CV

**LIVING CENTERS OF TEXAS, INC.**, Cyndi Brown, LNFA, and
Kimberly Bordovsky, DON,
Appellants

v.

**AUGUSTINE PEÑALVER**, Individually and as Independent Executor
of the Estate of Maria Belia Peñalver, Deceased, and
Ramon Peñalver,
Appellees

From the Probate Court Number 1, Bexar County, Texas
Trial Court No. 2001-PC-0706
Honorable Polly Jackson Spencer, Judge Presiding

Opinion by:     Steven C. Hilbig, Justice

Sitting:        Phylis J. Speedlin, Justice
                Rebecca Simmons, Justice
                Steven C. Hilbig, Justice

Delivered and Filed: April 28, 2010

AFFIRMED

Living Centers of Texas, INC., Cyndi Brown, LNFA, and Kimberly Bordovsky, DON,

(collectively "Living Centers") appeal the judgment awarding survival and wrongful death damages

to the estate of Maria Belia Peñalver and her sons, Augustine and Ramon Peñalver (collectively "the

Peñalvers"). Living Centers complains the trial court erred in charging the jury and the evidence is

factually insufficient to support the damage awards. It seeks a reversal of the judgment and remand for a new trial or a remittitur of damages. In a cross-point, the Peñalvers seek attorney's fees as sanctions for a frivolous appeal. We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Maria Belia Peñalver moved into one of Living Centers' nursing homes in 1997 because she needed twenty-four hour care. On September 25, 2000, a nursing home employee dropped Mrs. Peñalver while transferring her from a wheelchair to her bed, and Mrs. Peñalver's head struck a night stand. Mrs. Peñalver's injuries included a lacerated earlobe, multiple contusions on the left side of her head and body, a subdural hematoma, and an intracerebral hemorrhage. She died at the hospital the next morning.

The executor of Mrs. Peñalver's estate and her two adult sons, Augustine and Ramon, sued Living Centers, its administrator, and its director of nursing for wrongful death and survival damages. This appeal follows the third jury trial in the Peñalvers' wrongful death and survival suit.[1] At the beginning of trial, appellants stipulated "to their joint and several liability for negligence proximately causing the death of Maria Belia Peñalver." The case was tried solely on the issues of

---

[1] The first jury awarded $356,000 in compensatory damages and $500,000 in punitive damages, which the trial court reduced to $362,000 because of the statutory punitive damages cap. *Peñalver v. Living Centers of Texas Inc.*, No. 04-02-00920-CV, 2004 WL 1392268, at *1 (Tex. App.—San Antonio, Jun. 23, 2004, no pet.) (mem. op.). This court reversed and remanded for a new trial after holding the trial court improperly admitted evidence and that the punitive damages claim was discharged by Living Centers's bankruptcy reorganization plan. *Id.* at *4-*5. Living Centers, Brown and Bordovsky stipulated to liability before the second trial, and the trial court rendered judgment on the verdict of $510,000 to the estate and $300,000 each to Ramon and Augustine. *Living Centers of Texas, Inc. v. Peñalver*, 217 S.W.3d 44 (Tex. App.—San Antonio 2006), *rev'd*, 256 S.W.3d 678 (Tex. 2008) (per curiam). That judgment was ultimately reversed because of plaintiff's counsel's incurable jury argument, and the cause was remanded to the trial court for a third trial. 256 S.W.3d at 682.

damages. The jury awarded $306,000 to the estate and $420,000 each to Ramon and Augustine.[2]
The trial court rendered judgment on the verdict and denied Living Centers's motion for new trial
or for remittitur.

## CHARGE ERROR

In its first two issues, Living Centers argues the trial court committed reversible error by
failing to include its requested instructions in the jury questions concerning Augustine's and
Ramon's damages. Living Centers contends the requested instructions were "necessary to remove
from the jury's consideration irrelevant evidence and testimony."

When feasible, the trial court must submit a cause to the jury using broad-form questions.
TEX. R. CIV. P. 277. The court must also "submit such instructions and definitions as shall be proper
to enable the jury to render a verdict." *Id.* The trial court has considerable discretion in determining
what instructions are necessary and proper. *Interstate Northborough P'ship v. State*, 66 S.W.3d
213, 224-25 (Tex. 2001). We review the trial court's refusal of a requested instruction for abuse of
discretion. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009).

Jury questions 2 and 3 asked the jury to determine the wrongful death damages suffered by
Augustine and Ramon. Jury question number 2 read:

> What sum of money, if paid now in cash, would fairly and reasonably
> compensate Augustine Peñalver for his damages, if any, resulting from the death of
> Maria Belia Peñalver.

---

[2] The jury found damages in the survival action as follows: pain and mental anguish suffered by Mrs.
Peñalver, $300,000; and Mrs. Peñalver's medical expenses, $6,000. In the wrongful death action, the jury found damages
in identical amounts for Augustine and Ramon: past loss of companionship and society, $100,000; future loss of
companionship and society, $10,000; past mental anguish, $300,000; and future mental anguish, $10,000.

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Do not consider, discuss, or speculate whether any party is or is not subject to any damages limit under applicable law.

Answer separately, in dollars and cents, for damages, if any.

     a.      Loss of companionship and society sustained in the past.

             "Loss of companionship and society" means the loss of positive benefits flowing from the love, comfort, companionship, and society that Augustine Peñalver, in reasonable probability, would have received from Maria Belia Peñalver had she lived.

             Answer: _____

     b.      Loss of companionship and society that, in reasonable probability, Augustine Peñalver will sustain in the future.

             Answer: _____

     c.      Mental anguish sustained in the past.

             "Mental anguish" means the emotional pain, torment, and suffering experienced by Augustine Peñalver because of the death of Maria Belia Peñalver.

             Answer: _____

     d.      Mental anguish that, in reasonable probability, Augustine Peñalver will sustain in the future.

             Answer: _____

In determining damages for elements a, b, c, and d, you may consider the relationship between Augustine Peñalver and Maria Belia Peñalver, their living arrangements, any extended absences from one another, the harmony of their family relations, and their common interests and activities.

-4-

Question number 3 was identical to question number 2, but concerned Ramon's damages. The trial court denied Living Centers's requests that the trial court give the jury the following instructions in connection with questions 2 and 3:

> In determining damages for elements a, b, c, and d, do not consider the nature of the conduct, acts or omissions of the Defendants, their agents or employees.
>
> In determining damages for elements a, b, c, and d, do not consider the physical condition of Maria Belia Peñalver after the fall on September 25, 2000.
>
> In determining damages for elements a, b, c, and d, do not consider the effect on August [or Ramon] Peñalver, if any, of his observation of Maria Belia Peñalver after the fall on September 25, 2000 or during her medical care and treatment following the fall on September 25, 2000.

### *Instructions Regarding Irrelevant "Bystander Evidence"*

In its first issue, Living Centers contends its requested instructions were "necessary to remove from the jury's consideration irrelevant evidence and testimony regarding bystander mental anguish damages which are unrecoverable in this medical malpractice case as a matter of law." It argues that the court's refusal to submit the instructions "resulted in a jury charge with damages questions that mix valid and invalid theories of recovery and/or measures of damages." We disagree.

Living Centers's argument is based on the holding in *Edinburg Hosp. Authority v. Trevino* that a bystander to medical malpractice does not have a cause of action to recover mental anguish damages. 941 S.W.2d 76, 80-81 (Tex. 1997). In *Edinburg Hospital*, a couple alleged that medical malpractice during labor resulted in the delivery of a stillborn fetus and they sought to recover damages for their mental anguish. *Id.* at 77. The court iterated its earlier holding that there was no

wrongful death cause of action for the loss of a fetus when no live birth had occurred. *Id.* at 78 (*citing Witty v. Am. Gen. Capital Distribs., Inc.*, 727 S.W.2d 503, 504 (Tex. 1987)). The court held the wife's only viable cause of action was for the hospital's negligent treatment of her that resulted in personal injury, including mental anguish, to her. *Id.* The husband alleged he suffered severe mental anguish when he witnessed the hospital staff commit malpractice on his wife during her labor, and argued he could recover as a bystander to his wife's injuries.[3] *Id.* at 80. The supreme court noted that the nature of medical treatment can be traumatic to a layperson, and even a beneficial procedure may shock the senses of a bystander. *Id.* at 81. Because a medical provider's primary duty is to the patient and not to the patient's relatives who may be watching, the court concluded for policy reasons that it should not recognize a bystander cause of action in medical malpractice cases. *Id.* The court held the husband did not state a valid cause of action to recover for the mental anguish he suffered as a bystander to the malpractice upon his wife. *Id.*

Living Centers argues this holding in *Edinburg Hospital* precludes Augustine and Ramon from recovering for any mental anguish they suffered because Mrs. Peñalver was dropped or that resulted from seeing her condition after she was dropped, watching her deteriorate, or being with her when she died because such are "unrecoverable bystander mental anguish damages." Living Centers

---

[3] A bystander who witnesses a negligently inflicted injury may recover for the mental anguish suffered if: (1) the bystander was near the scene of the accident; (2) "the shock resulted from a direct emotional impact upon the bystander from the sensory and contemporaneous observance of the accident;" and (3) the bystander and the victim were closely related. *Edinburg Hosp.*, 941 S.W.2d at 80; *Freeman v. City of Pasadena*, 744 S.W.2d 923, 924 (Tex. 1988).

contends its requested instructions were necessary to preclude the jury from considering "irrelevant evidence regarding bystander damages."[4]  We disagree.

The Texas Wrongful Death Act provides a statutory cause of action for damages arising from a negligently inflicted injury that causes an individual's death.  TEX. CIV. PRAC. & REM. CODE ANN. § 71.02 (Vernon 2008).  Statutory wrongful death beneficiaries, including the decedent's children, may recover damages for the mental anguish they suffer as a result of the wrongful death.  *Moore v. Lillebo*, 722 S.W.2d 683 (Tex. 1986).  The questions and accompanying definitions and instructions the trial court submitted to the jury fully complied with the Texas Supreme Court's dictates for charging the jury in wrongful death cases.  *See id.* at 687-88; TEXAS PATTERN JURY CHARGES: GENERAL NEGLIGENCE & INTENTIONAL TORTS PJC 9l.3 (2008).  Moreover, the holding in *Edinburg Hospital* has no application in this case.  Ramon and Augustine were not "bystanders" to the medical malpractice that caused Mrs. Peñalver's injuries.  The Peñalvers did not assert a bystander cause of action, they did not allege or present any evidence that they witnessed the accident or were anywhere in the vicinity when Mrs. Peñalver was dropped, and they did not contend they suffered mental anguish from witnessing any medical treatment of Mrs. Peñalver by Living Centers or its nursing home staff.  Rather, the Peñalvers asserted a cause of action for wrongful death under the Texas Wrongful Death Act, and they were entitled under that Act to be fairly compensated

---

[4]  Throughout its appellate briefs, Living Centers states the trial court admitted irrelevant evidence about the nature and circumstances of the accident, Mrs. Peñalver's physical condition after the accident, and what Ramon and Augustine experienced from the time Mrs. Peñalver was taken from the nursing home by ambulance until she died in the hospital the next morning.  However, Living Centers only objected to some of this evidence at trial, conceded some of the evidence was relevant to some of the issues, did not ask for any limiting instructions when the evidence was admitted, and offered some of the evidence itself.  More significantly, Living Centers does not argue on appeal that the trial court erred in admitting any of the evidence.

for the mental anguish they suffered because of the "harrowing experience" of Mrs. Peñalver's death. *See Moore*, 722 S.W.2d at 688. The wrongful death damages were properly submitted to the jury and were not mixed with any invalid theories of recovery or measures of damage. Living Centers's proposed instructions were not necessary to properly charge the jury and the trial court did not abuse its discretion in refusing them.

### *Instruction Regarding Nature of Defendants' Conduct*

In its second issue, Living Centers contends the trial court's failure to instruct the jury not to consider evidence of the nature of defendants' conduct, acts, or omissions in deciding damages allowed the jury to consider that evidence in its compensatory damage awards. During the trial, the jury heard evidence about the causes and circumstances of Mrs. Peñalver's fall and the knowledge and training of Living Centers's agents and employees. Living Centers argues that because neither liability nor punitive damages were in issue, this evidence was irrelevant and the proposed limiting instruction was required. Living Centers contends that without the instruction "it is impossible to know whether the jury based its damages awards in Questions Nos. 2 & 3 on the proper measure of damages for loss of companionship and society and mental anguish or on improper measure of damages that allowed the jury to award more money based on Appellants' liability or to punish Appellants for their purported conscious indifference." We again disagree.

The jury was correctly charged on the definitions of loss of companionship and society and mental anguish, and correctly instructed on the factors to consider in determining damages for those elements. The charge, as given to the jury, did not authorize the jury to punish Living Centers or to award higher damages based on evidence about the nature of Living Centers's conduct. We presume

the jury followed the instructions given in the charge unless the record demonstrates otherwise. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003). Living Centers has not provided any explanation of how the jury, if it followed the instructions in the charge, would have awarded higher damages in answers to questions 2 and 3 simply because it heard evidence about the causes and circumstances of Mrs. Peñalver's injury. Nor has Living Centers pointed to anything in the record to suggest the jury did not follow the instructions in the charge. Because the instruction was not necessary to enable the jury to render a proper verdict, the trial court did not abuse its discretion in refusing to submit the instruction. *See Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 911-912 (Tex. 2000).

### FACTUAL SUFFICIENCY OF THE EVIDENCE

Living Centers next challenges the factual sufficiency of the evidence to support the jury's award of damages for Mrs. Peñalver's conscious pain and mental anguish, and its awards for Augustine's and Ramon's loss of companionship and mental anguish.

In reviewing the factual sufficiency of the evidence to support a jury's damage award, we must consider and weigh all of the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998). We may set aside the jury's finding only if the evidence supporting it is so contrary to the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Id.* at 407. In our review, we "may not pass upon the witnesses' credibility or substitute [our] judgment for that of the jury, even if the evidence would clearly support a different result." *Id.* Moreover, because damages for pain and suffering, mental anguish, and loss of companionship are "unliquidated and incapable of precise mathematical calculation, the jury is given significant

-9-

discretion in fixing the amount of the award," so long as it has some evidentiary support. *Thomas v. Uzoka*, 290 S.W.3d 437, 454 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

### Mrs. Peñalver's conscious pain and mental anguish

In question number 1, the jury was asked what sum of money would have fairly and reasonably compensated Maria Belia Peñalver for her pain and mental anguish. "Pain and mental anguish" was defined as

> the conscious physical pain and emotional pain, torment, and suffering experienced by Maria Belia Peñalver before her death as a result of the occurrence in question.

The jury was instructed not to include any amount for any condition not resulting from "the occurrence in question." The jury found $300,000, and the trial court awarded Mrs. Peñalver's estate that amount in its judgment. Living Centers argues the evidence is factually insufficient to support the award because Mrs. Peñalver was "unconscious and comatose within one hour and forty-five minutes of the fall and . . . when comatose, she did not feel pain."

Only the pain and mental anguish the deceased consciously experienced is compensable. *Las Palmas Med. Ctr. v. Rodriguez*, 279 S.W.3d 413, 417 (Tex. App.—El Paso 2009, no pet.); *Lee Lewis Constr. Inc. v. Harrison*, 64 S.W.3d 1, 14 (Tex. App.—Amarillo 1999), *aff'd*, 70 S.W.2d 778 (Tex. 2001). A jury may infer some degree of physical pain and mental suffering when severe injuries have been inflicted. *City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997); *Tx. & P. Ry. Co. v. Curry*, 64 Tex. 85, 87-88 (Tex. 1885). When the existence of some pain and mental anguish is established, the jury is given considerable discretion in determining the amount of fair and reasonable compensation. *Lee Lewis*, 64 S.W.3d at 14; *Skaggs Alpha Beta, Inc. v. Nabhan*, 808 S.W.2d 198, 202 (Tex. App.—El Paso 1991, no writ).

When Mrs. Peñalver was dropped, she hit her head on a hard object, causing a laceration to her ear, multiple contusions, and a subdural hematoma. Additionally, her left eye had a hemorrhage and the left side of her head was swollen. The medical experts testified the significant head trauma induced a slow bleed in Mrs. Peñalver's brain that eventually caused her death.

The unit supervisor at the nursing home was informed of the accident at 1:40 p.m. Nursing home staff testified that immediately after the accident, Mrs. Peñalver's ear was bleeding and the side of her head was swollen. She was moaning and appeared to be in pain. A nurse conducted a neurological assessment at 1:50 p.m. and noted that Mrs. Peñalver was conscious and alert; she was moaning and was responsive to pain. Mrs. Peñalver was taken by ambulance to a hospital emergency room. The doctor who assessed Mrs. Peñalver in the emergency room at 4:05 p.m. indicated she was alert and in moderate pain at that time. Some time after emergency room assessment, she lapsed into a coma from which she did not recover.

Dr. Vincent DiMaio, testified as a retained expert for the Peñalvers. Dr. DiMaio testified the medical records reflect that about one inch of Mrs. Peñalver's left earlobe was torn completely through. According to Dr. DiMaio, a substantial amount of blunt force to the side of Mrs. Peñalver's head would have been required to cause this injury. From his review of the medical records, it is clear Mrs. Peñalver was conscious and feeling pain at 4:05 p.m., more than two hours after the fall. Dr. DiMaio acknowledged that he had testified in a deposition that he believed Mrs. Peñalver was comatose within one hour and 45 min of the fall. However, he testified at trial that his earlier opinion was based on his knowledge of her injuries and was given without the benefit of reviewing all of the records. After reviewing all the medical records, including those of the nursing home, Dr.

DiMaio's opinion, based on reasonable medical probability, was that Mrs. Peñalver was conscious, feeling, and appreciating pain from the time she was dropped until the doctor evaluated her in the emergency room.

Dr. Donald Richardson, a neurosurgeon, testified by deposition that based on Mrs. Peñalver's injuries, he would have expected Mrs. Peñalver to be poorly responsive two hours after the fall, rather than alert. He also indicated there might be some conflict in the hospital's records, noting that a nurse's notes made when Mrs. Peñalver arrived at the hospital stated she was "comatose," but responsive to pain; whereas the later doctor's report of the initial medical examination states Mrs. Peñalver was "alert." Dr. Richardson explained that many people use the word "comatose" incorrectly. When someone is comatose, she is not responsive to pain.

Mrs. Peñalver was discharged from the emergency room at 6:45 p.m. The discharge notes state Mrs. Peñalver's condition was "improved," and that she responded to pain, but was otherwise unresponsive. Thereafter, Mrs. Peñalver's condition deteriorated. It is undisputed that some time before 8:30 p.m., she was completely unresponsive, even to pain.

Mrs. Peñalver suffered a significant blow to her head in the fall, which ripped her ear and left her moaning in pain. From the evidence, the jury could have found Mrs. Peñalver remained conscious and was feeling pain for at least two hours and twenty minutes. We conclude the evidence is factually sufficient to support the jury's award to Mrs. Peñalver's estate and the award is not excessive.

### *Damages for Loss of Companionship and Society and Mental Anguish*

The jury awarded Augustine and Ramon $100,000 each for loss of their mother's companionship and society sustained in the past and $10,000 for loss of companionship and society in the future. The jury awarded them each $300,000 for mental anguish suffered in the past and $10,000 for future mental anguish. In its fourth issue, Living Centers contends the jury's award of damages for loss of companionship and society and for mental anguish to Augustine is supported by factually insufficient evidence. In its fifth issue, Living Centers makes the same argument with respect to the award of damages to Ramon. Living Centers asserts the awards for loss of companionship and society should be reversed because the Peñalvers did not present evidence of Mrs. Peñalver's life expectancy and presented insufficient evidence of the quality of any companionship she would have provided had she not been dropped. Living Centers contends the evidence of mental anguish is factually insufficient because most of the evidence the Peñalvers rely on related to the manner of or circumstances surrounding Mrs. Peñalver's death and is irrelevant.

*"*All wrongful death actions are predicated on the proposition that a wrongful death necessarily destroys any pre-existing family relationship." *Moore*, 722 S.W.2d at 685. The non-economic damages awarded in wrongful death cases compensate for the losses caused by that destruction. *See id.* at 687-88. "Companionship and society" refers to "the positive benefits flowing from the love, comfort, companionship, and society the named plaintiff would, in reasonable probability, experience if the decedent lived." *Id.* at 688. Damage awards for loss of companionship compensate for "the loss of the positive benefits the beneficiary once enjoyed but which were taken away by the wrongful death." *Thomas*, 290 S.W.3d at 456; *see Moore* 722 S.W.2d at 688.

"Mental anguish" on the other hand, refers to the negative impact the wrongful death has on the beneficiary. *Moore*, 722 S.W.2d at 687-88; *Thomas*, 290 S.W.3d at 455-56. "In most death cases, the emotional impact of the loss of a beloved person 'is the most significant damage suffered by surviving relatives.'" *Moore*, 722 S.W.2d at 685 (quoting S. Speiser and S. Malawer, *An American Tragedy: Damages for Mental Anguish of Bereaved Relatives in Wrongful Death Actions*, 51 TULANE L. REV. 1, 17 (1976)). "Mental anguish" is the emotional pain, torment, and suffering the beneficiary would, in reasonable probability, experience from the wrongful death of the family member. *Moore*, 722 S.W.2d at 688. Damages for mental anguish are focused on "compensating the bereaved for their harrowing experience resulting from the untimely, preventable and otherwise unnecessary death of one with whom they have shared a special emotional relationship." *Sanchez v. Schindler*, 651 S.W.2d 249, 259 (Tex. 1983) (on rehearing, Ray, J. Concurring); *P.T. & E. Co. v. Beasley*, 698 S.W.2d 190, 198 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.). No physical manifestation of mental anguish is necessary to recover mental anguish in wrongful death cases, and the issue can be submitted to the jury on the basis of the impact suggested by the circumstances surrounding the loss. *Moore*, 722 S.W.2d at 686. However, in the absence of physical injury, there must be evidence of the nature, duration, or severity of the plaintiff's anguish or other evidence of a high degree of mental pain and distress. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

Although the two elements of damages — mental anguish and loss of companionship and society — are separate and do not overlap, the jury may consider some of the same factors in determining how much, if any to award: (1) the relationship between decedent and beneficiary; (2)

the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) their common interests and activities. *Moore*, 722 S.W.2d at 688; *Thomas*, 290 S.W.3d at 456.[5]

Mrs. Peñalver was 90 years old when she died. The evidence established the Peñalvers had always been a very close family with strong bonds. Mrs. Peñalver instilled values of faith and responsibility in her sons and supported the decisions they made as adults. After Augustine's and Ramon's father died in 1965, Mrs. Peñalver never remarried, and her sons remained close to her throughout their adulthood. The only extended absences Augustine and Ramon had from their mother was during the periods they were posted overseas during their service in the Air Force.

Augustine returned to San Antonio after retiring from the military and went to work for the postal service. He bought Mrs. Peñalver a house and lived with her until she moved into the nursing home. In the late 1980s, Augustine began working part time so he could spend more time with his mother. Ramon also returned to San Antonio after leaving the Air Force. From 1974 until 1991, his job with the Federal Aviation Administration took him to various towns in West Texas. During that time Augustine and Mrs. Peñalver visited Ramon and his family as often as possible. Mrs. Peñalver would sometimes stay several months. Ramon retired in 1991 and returned to San Antonio, in part so he could spend more time with his mother.

When Mrs. Peñalver had a stroke in the early 1990s, her doctors began recommending she move into a skilled nursing facility. Augustine and Ramon rejected that recommendation for many

---

[5] Living Centers has not cited any authority for its contention that an award for loss of society and companionship *requires* proof of how long the decedent would have been expected to live.

years and took care of their mother themselves. Mrs. Peñalver had a second stroke in 1996, and began having seizures. In 1997, Augustine and Ramon reluctantly agreed she should move into a nursing home. Ramon testified it was not an easy decision.

Staff at the nursing home testified they saw very few families as actively involved in the day-to-day care of a resident as the Peñalvers. During Mrs. Peñalver's three years at the nursing home, at least one family member visited her every day and often spent the entire day there. Augustine, Ramon, or Ramon's wife Sofia was with Mrs. Peñalver most days from early in the morning until bedtime. The jury learned they socialized with her, took her out for walks or on outings, took her out shopping, and always took her out on holidays. Augustine testified he and his mother continued to enjoy many of the things they shared during the many years they lived together — eating meals together, reading, praying, and watching TV together. In addition, they helped her with her grooming and dressing. Augustine testified his mother was a "clothes horse" who took pleasure in being well-dressed. He or Sofia took all of Mrs. Peñalver's clothes home, washed and ironed them, and returned them. The nursing home administrator testified Mrs. Peñalver was always very well dressed, complete with jewelry and makeup.

In mid-2000, Mrs. Peñalver's treating physician discussed hospice care and a "do not resuscitate" order with the family because of her deteriorating health. They decided against both. Augustine acknowledged he had been aware of his mother's serious medical conditions for a long time, and had taken the opportunity to say his goodbyes to her. He explained that was why the family worked so hard to care for her. Ramon testified his mother had severe osteoporosis and had swelling due to the strokes that required her to have a feeding tube inserted. Mrs. Peñalver also had

congestive heart failure for about a year, for which she took medication, but she was not on oxygen and did not have difficulty breathing. Ramon emphasized that notwithstanding his mother's health issues, "[n]obody said she was ready to die;" "No doctor said she's got a week, a month, a year." He testified his mother was a survivor; she had survived breast cancer when the doctors doubted she would. Ramon recognized his mother had health problems, but emphasized that "she would always come back."

Augustine and Ramon testified that Mrs. Peñalver's health problems did not prevent her from enjoying her life and her time with her family. She was not bedridden. She had friends in the nursing home and enjoyed seeing and visiting them. She enjoyed going to the dining room for meals. She lost weight after the feeding tube was inserted, so her family began preparing some of her favorite foods and learned how to feed them to her. Mrs. Peñalver regained the weight. Augustine testified his mother loved it when they brought her pudding, sweet potatoes, or ice cream. She was happy and would get a gleam in her eye from which Augustine derived great enjoyment. The nurse's progress notes for the last month of Mrs. Peñalver's life indicated Mrs. Peñalver was usually alert and responsive, and was talkative at times. She watched television and fed herself ice cream. Augustine and Ramon testified that although she did not engage in lengthy conversations, she did not have any problem communicating. The nursing home staff who saw this family together could see that Augustine and Ramon were emotionally dedicated to their mother. They enjoyed their mother's company and it gave them pleasure to make her happy.

When Augustine and Ramon were notified about the accident, both immediately went to the nursing home and found emergency personnel attending to her. Ramon testified Mrs. Peñalver was

in bed moaning when he arrived. He expected she would be taken to the hospital to get stitches in her ear, and then she would be fine and return to the nursing home. However, when she was discharged from the emergency room and taken back to the nursing home, she was unresponsive and the nursing home would not accept her. The ambulance then took Mrs. Peñalver to a hospital, where she was admitted. At about ten o'clock that night, the doctors told Augustine and Ramon that their mother's condition was terminal. They decided to sign a "do not resuscitate" order and called a priest, who came to the hospital room and administered last rites. Ramon testified they then just waited and waited; he and his brother stayed with their mother for ten hours until she passed. She was bleeding from her nose and there was nothing the hospital staff could do for her. Augustine testified that being with his mother in the hospital the day she died was the most horrible experience anyone can go through. He and Ramon were with her the entire night, each holding one of her hands. They watched clouds of black breath coming out of her mouth and nose and were begging her to die. Augustine testified he will never be able to forget the experience.[6]

---

[6] Living Centers contends the evidence of the manner of or circumstances surrounding Mrs. Peñalver's death and Augustine's and Ramon's response to it is irrelevant to the issue of recoverable mental anguish damages and the jury should have been instructed to disregard it. We disagree. The manner and circumstances of the wrongful death can have a profound effect on the emotional pain and torment suffered by the deceased's kin, and were properly considered by the jury in determining fair and reasonable compensation for mental anguish. *See Sanchez*, 651 S.W.2d at 259 (mental anguish damages compensate for the "harrowing experience resulting from the untimely, preventable and otherwise unnecessary death of one with whom they have shared a special emotional relationship") (on rehearing, Ray, J. concurring); *see e.g., Phillips v. Bramlett*, 258 S.W.3d 158, 175-76 (Tex. App.–Amarillo 2007) (per Hancock, J., with one Justice concurring in result) (evidence of circumstances of death considered important in evaluating sufficiency challenge to mental anguish award), *rev'd on other grounds*, 288 S.W.3d 876 (Tex. 2009); *Harris Co. Hosp. Dist. v. Estrada*, 872 S.W.2d 759, 763 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (evidence that family watched decedent suffer a slow and painful death considered in evaluating sufficiency of evidence supporting mental anguish award); *Exxon Corp. v. Roberts*, 724 S.W.2d 863, 868 (Tex. App.—Texarkana 1986, writ ref'd n.r.e.) (evidence that spouse watched husband and ministered to him as he was dying from his injuries supported mental anguish award).

Ramon testified he wanted his mother to have a comfortable, natural death in the nursing home. What occurred caused him to get very angry and that anger has stayed with him. Ramon testified he continues to experience grief and sadness because his mother did not have a peaceful passing. He doubts he will ever totally overcome his anger and his grief.

Augustine testified he feels significant grief, anger, guilt, and frustration over his mother's death. He feels guilt and regret about his decision to put her in the nursing home. Augustine sought counseling from his priest after Mrs. Peñalver died. He then started seeing a psychiatrist, who helped him some with the anger and guilt he felt. The psychiatrist's records document that Augustine was angry, felt guilty, often cried, and had difficulty sleeping. Augustine stopped seeing the psychiatrist after a year because of an accident involving the psychiatrist. He tried once to see another psychiatrist, but did not want to start all over with another person. At trial, more than eight years after Mrs. Peñalver's death, Augustine testified his grief had lessened, but he still had anger and frustration about having to beg her to die and he continued to have nightmares.

"Although Mrs. Peñalver had lived for almost ninety years at the time of her death, and each son had begun to prepare for their mother's eventual death before September 2000, it is clear from this record that both men suffered mental anguish over the manner of their mother's negligently-caused death and it is also clear that her death left a vacuum in this family." *Living Centers of Texas, Inc. v. Peñalver*, 217 S.W.3d 44, 56 (Tex. App.—San Antonio 2006), *rev'd on other grounds*, 256 S.W.3d 678 (Tex. 2008) (per curiam). As in the earlier trial of this case, the jury heard evidence showing that Mrs. Peñalver, even in her infirm condition, gave her children love, companionship, and joy. She was a "fighter" and she played a vital role in this family. Absent Living Centers's

negligence, she would have continued to provide companionship and positive benefits to her family. Her death and her absence from the lives of her family continued to have a profound impact on them at the time of the third trial, more than eight years later.

We hold the evidence is factually sufficient to support the damage awards to Augustine and Ramon for past and future loss of companionship and society and past and future mental anguish, and the awards are not excessive or manifestly unjust.

### CROSS POINT FOR FRIVOLOUS APPEAL

The Peñalvers filed a cross-point pursuant to rule 45 of the Texas Rules of Appellate Procedure, seeking an award of $25,000 in attorney's fees as sanctions for filing a frivolous appeal. Whether to grant or deny appellate sanctions is left to our discretion. *Kniestedt v. Sw. Sound & Elecs., Inc.*, 281 S.W.3d 452, 455 (Tex. App.—San Antonio 2007, no pet.). Although we disagree with the merits of Living Centers's appeal, we do not find it to be objectively frivolous, and we decline to impose sanctions.

### CONCLUSION

The judgment of the trial court is affirmed.

Steven C. Hilbig, Justice